# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CENTREVILLE CITIZENS FOR CHANGE, WALTER BYRD, LESTER GOREE, WILLIAM MCNEAL, DELORES SAFFOLD-CRIGLER, BARBARA EILAND, SHARON and BOBBY SMITH, YVETTE LYLES, PATRICIA GREENWOOD, LEON SPRUELL, MARIO and TAMARA GLADNEY, HATTIE IVY, SHEILA GLADNEY, JOAN DANCY, MICHAEL and PATRICIA JOHNSON, VANESSA MARION, CAROLYN and MAURICE TAGGART, LEICHUE HYCH and LAKESHA WARE, MARY ANTHONY, LEOLA GREEN, JEANETTE GREEN, VITTORIO BLAYLOCK and ALLENE HOPKINS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 21-842 |
| | ) | **JURY TRIAL DEMANDED** |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | |
| COMMONFIELDS OF CAHOKIA PUBLIC WATER DISTRICT, and the CITY OF CAHOKIA HEIGHTS, | ) ) ) ) | |
| *Defendants.* | ) ) | |

# Table of Contents

INTRODUCTION ...................................................................................................... 1

NATURE OF THE CASE ........................................................................................... 3

JURISDICTION AND VENUE ................................................................................. 3

PARTIES .................................................................................................................... 5

I.     Defendant Cahokia Heights .......................................................................... 5

II.    Defendant Commonfields of Cahokia Public Water District ....................... 5

III.   Plaintiff Centreville Citizens for Change ..................................................... 7

IV.   Individual Plaintiffs ...................................................................................... 9

LEGAL BACKGROUND ......................................................................................... 45

I.     Clean Water Act ........................................................................................... 45

II.    Federal and Illinois Takings Clauses ........................................................... 47

III.   Private and Public Nuisance ......................................................................... 47

IV.   Negligence .................................................................................................... 48

V.    Negligent Trespass ....................................................................................... 50

FACTUAL BACKGROUND .................................................................................... 50

I.     Commonfields' Sewage System is Failing. .................................................. 50

      A. Commonfields does not have a Clean Water Act permit and does not routinely inspect nor maintain its sewage system. ................................................ 50

      B. Commonfields' sewage system has deteriorating pipes, broken lift stations, and allows the inflow of stormwater and infiltration of groundwater. ........................ 51

      C. Commonfields' broken sewage system regularly discharges sewage. ............... 53

      D. The failures of Commonfields' system have been widely known for years. ....... 60

II.    Commonfields' Sewage System is Discharging Raw Sewage on North 82nd Street to Waters of the United States. ....................................................................... 62

III.   Members of Centreville Citizens for Change are Harmed by Commonfields' Clean Water Act Violations. ............................................................................. 69

IV.   State and Federal Government Enforcement Actions Have Not Stopped the Sewage Discharges or Clean Water Act Violations. ....................................... 70

V.    Cahokia Heights' Sewage System is Failing. .............................................. 71

VI.   Cahokia Heights' Stormwater System is Also Failing. ................................ 74

VII.  The Sewage and Flooding Problems in Centreville Are Related. ................ 77

CAUSES OF ACTION .............................................................................................. 78

PRAYER FOR RELIEF ............................................................................................ 100

## COMPLAINT

## INTRODUCTION

Decades of government failure to ensure basic sewage and stormwater services in the area of Cahokia Heights, Illinois formerly known as Centreville, have created an environmental injustice for this Black community and have polluted waters of the United States. In Centreville, raw sewage pools in yards, bubbles out of manholes, runs down neighborhood roadside ditches, and backs up into tubs, toilets, and sinks. On one residential street, North 82nd Street, a fountain of raw sewage spews from Defendant Commonfields of Cahokia Public Water District's ("Commonfields") sewage system on a nearly daily basis, even during dry weather conditions. Families and children are forced to see and smell the stream of sewage, complete with a trail of toilet paper debris. The sewage stream flows into waterways in Centreville, including tributaries to the Mississippi River, in violation of the Clean Water Act.

Raw sewage also routinely flows to locations throughout Centreville from another municipal sewage system operated by Defendant City of Cahokia Heights ("Cahokia Heights"), including to a wetland. Both Commonfields' and Cahokia Heights' sewage systems are dysfunctional and suffer from years of neglect. The pipes are deteriorating and allow stormwater and groundwater to enter the sewage systems, and the equipment that pumps sewage through the systems is broken.

Commonfields' and Cahokia Heights' sewage system failures pose grave health risks to individual resident Plaintiffs ("Individual Plaintiffs") and to members of Plaintiff Centreville Citizens for Change ("Centreville Citizens for Change"), an organization formed by residents to advocate for solutions to the sewage pollution and the chronic flooding that also plagues the community. The sewage system failures have additionally caused property damage to residents'

1

homes, stopped toilets from flushing, and prevented residents, including members of Centreville Citizens for Change, from conducting simple activities such as sitting in their yard, inviting friends and family over, and fishing in their community.

Cahokia Heights is also responsible for managing stormwater in the Centreville area, but it has failed to develop functional stormwater infrastructure or maintain the existing stormwater infrastructure to ensure it channels water away from residential homes. As a result, many Centreville neighborhood streets, yards, and homes frequently flood during mild or severe rain events. The floodwaters quickly become lake-like, attracting fish and ducks. These relentless floods have entered many residents' yards and homes and have destroyed crawl spaces, floors, and household appliances such as furnaces and hot water heaters. The floodwaters often take days to recede and sit underneath some residents' homes, undermining their foundations. Residents have been trapped in their homes for days after rains, and some have even required rescuing by boat. Even after the water recedes from homes and yards, the ditches in front of residents' homes hold stagnant water and become mosquito breeding grounds in warm months.

The combination of mismanaged stormwater infrastructure and broken sewage systems further compounds the destruction wrought by each alone. Floodwaters become a vehicle for spreading overflowing sewage and odors throughout yards and inside homes. The broken sewage system infrastructure also allows the excessive stormwater to enter the sewage systems, which adds pressure to the systems and leads to more sewage overflows. These connected failures have created a vicious cycle of pollution and flooding that endangers Individual Plaintiffs and members of Centreville Citizens for Change, contaminates waters, and leaves destroyed property in its wake.

## NATURE OF THE CASE

1.     Centreville Citizens for Change sues Commonfields for violating section 301 of the Clean Water Act, 33 U.S.C. § 1311, by illegally discharging sewage into tributaries to the Mississippi River through certain pipes, drainage ditches, and other conveyances of Commonfields' sewage system without a permit. Centreville Citizens for Change seeks a declaratory judgment, injunctive relief, and civil penalties.

2.     Individual Plaintiffs also sue Commonfields and Cahokia Heights for unlawfully taking private property in violation of the Fifth Amendment Takings Clause of the U.S. Constitution and the Takings Clause of the Illinois Constitution, and/or for negligent trespass, negligence, private nuisance, and public nuisance. Commonfields and Cahokia Heights have caused sewage and stormwater to enter Individual Plaintiffs' yards and homes. The Individual Plaintiffs seek damages and injunctive relief.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over the Clean Water Act claims in this case pursuant to the "citizen suit" provision of the Clean Water Act, 33 U.S.C. § 1365(a). This Court also has subject matter jurisdiction over the Fifth Amendment takings claims, 42 U.S.C. § 1983. This Court also has federal question jurisdiction, 28 U.S.C. § 1331. To the extent the Complaint alleges non-federal claims, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 because those claims arise out of the same operative facts as Individual Plaintiffs' federal constitutional claims, and "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

4.      The relief sought is authorized by 33 U.S.C. §§ 1319 and 1365 (Clean Water Act) and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment and further necessary or proper relief).

5.      Venue is proper in the Southern District of Illinois and in this Court under 28 U.S.C. § 1391(b) and 33 U.S.C. § 1365 (c)(1) because Commonfields' unpermitted discharges, as well as Commonfields' and Cahokia Heights' other acts and omissions giving rise to Individual Plaintiffs' claims, are located, and are occurring in Cahokia Heights, Illinois, which is in this judicial district.

6.      In compliance with 33 U.S.C. § 1365(b)(1)(A), on April 23, 2021, Centreville Citizens for Change provided Commonfields with notice of the violations of the Clean Water Act specified in this Complaint and Centreville Citizens for Change's intent to file suit after sixty days should these violations continue. A copy of that notice with documentation of its receipt is attached as Exhibit A. Centreville Citizens for Change also provided notice to the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Acting Regional Administrator of the U.S. EPA Region 5, the Illinois Environmental Protection Agency ("Illinois EPA"), and the Illinois Attorney General. More than sixty days have elapsed since Centreville Citizens for Change provided Commonfields with notice, and the violations identified in that notice letter are continuing at this time and are likely to continue in the future.

7.      Neither the U.S. EPA nor the Illinois EPA has commenced or is diligently prosecuting a civil or criminal action in a court of the United States or a state to redress the alleged violations.

## PARTIES

### I.  Defendant Cahokia Heights

8.      Cahokia Heights is a municipality located in St. Clair County, Illinois.

9.      Prior to a recently approved merger that created Cahokia Heights, three separate municipalities existed: City of Centreville, Village of Alorton, and Village of Cahokia. Voters in the three municipalities approved the merger on November 3, 2020. The merger of the three municipalities officially took place on May 6, 2021. Throughout this Complaint, references to the obligations, actions, or inactions of Cahokia Heights also incorporate the obligations, actions, or inactions of its predecessor entities, including, but not limited to, the City of Centreville.

10.      The part of Cahokia Heights formerly known as the City of Centreville has approximately 5,000 residents. The population is almost entirely Black, and more than a third of the residents live below the poverty line.

11.      Cahokia Heights owns and operates the sanitary sewer systems that were previously owned and operated by City of Centreville, Village of Alorton, and Village of Cahokia.

12.      On information and belief, Cahokia Heights also owns and operates the stormwater systems that were previously owned by the City of Centreville as well as other merging entities.

### II.  Defendant Commonfields of Cahokia Public Water District

13.      Commonfields is a public water district created and existing under the laws of the State of Illinois and located in St. Clair County, Illinois. *See* Public Water District Act, 70 ILL. COMP. STAT. 3705/1 *et seq*.

5

14.     Commonfields owns, operates, and maintains a municipal sanitary sewer system in portions of Cahokia Heights, among other areas. In the portion of Cahokia Heights that was formerly known as the City of Centreville, Commonfields' system serves the areas northeast of the Frank Holten State Park lakes, as well as one area of Centreville southwest of the lakes. Commonfields also serves some portions of Cahokia Heights that were formerly known as the Village of Alorton and the Village of Cahokia. Commonfields' system serves approximately 7,000 to 8,000 customers.

15.     During the relevant time period, Commonfields had the authority to plan, manage, implement, control, and finance activities related to sewage management in its territory. (See Exhibit B).

16.      On April 6, 2021, voters within Commonfields' service area voted to dissolve Commonfields as a public water district. Illinois statutes require additional steps for a public water district to take before it can be formally dissolved by a state circuit court. *See* 70 ILCS §§ 3705/29-34.

17.     On information and belief, all of the required steps of dissolution have not yet occurred and Commonfields continues to exist as a public water district.

18.     On information and belief, the successor to Commonfields will be Cahokia Heights and Cahokia Heights will own and operate the sewage system currently operated by Commonfields.

19.     On information and belief, Dennis Traiteur, the current and past manager of Commonfields, will continue to be involved in the management of the Commonfields sewage system after ownership and operations are transferred to Cahokia Heights, and Lynn Branson-Matchingtouch will serve as the director of the Cahokia Heights Water and Sewage Department.

20.     On information and belief, Commonfields continues to pay the salary of Dennis Traiteur.

### III. Plaintiff Centreville Citizens for Change

21.     Centreville Citizens for Change is a community organization comprised of residents who live in the city formerly known as Centreville, who want a safe, decent, and healthy place to live. Specifically, Centreville Citizens for Change seeks functional sewage and stormwater systems, and a community free from sewage pollution and chronic stormwater flooding.

22.     The members of Centreville Citizens for Change live in many parts of the Centreville area of Cahokia Heights, but the majority of members live in two Centreville neighborhoods: Ping Pong and Piat Place. Ping Pong is located northeast of Frank Holten State Park, tucked between State Street and Lake Drive. Piat Place is located immediately west of Interstate 255, between Frank Holten State Park and Lake Drive to the south and State Street to the north. State Route 111 also runs through Piat Place.

23.     Several Centreville residents began to organize and meet quarterly with community organizations in October 2018. By August 2019, Centreville Citizens for Change was formed. Centreville Citizens for Change has approximately forty (40) members, who reside in Centreville. Most members of Centreville Citizens for Change have directly experienced stormwater flooding on their properties and/or sewage backups in their homes.

24.     Centreville Citizens for Change has made repeated attempts to persuade local and state leaders to protect their community from sewage pollution. For at least the past decade, residents of the area, including members of Centreville Citizens for Change, have complained of the sewage pollution to municipal, county, and state authorities, including the Illinois EPA. In

addition, on July 17, 2020, Centreville Citizens for Change submitted an investigation request to the Illinois Pollution Control Board pursuant to 415 ILCS 5/30, requesting that the Illinois EPA investigate Commonfields' sewage discharges and other violations of state environmental laws. Centreville Citizens for Change shared that request and documentation of Commonfields' violations of environmental laws with the U.S. EPA on July 24, 2020. Centreville Citizens for Change sent a letter with this documentation and requests for assistance to the Governor of Illinois on August 18, 2020.

25.     Members of Centreville Citizens for Change are being adversely affected and are suffering injuries in fact because of Commonfields' sewage discharges and Commonfields' failure to properly operate and maintain its sewage system, as well as Cahokia Heights' failure to properly operate and maintain both its sewage and its stormwater systems.

26.     For example, some members of Centreville Citizens for Change live on the residential block of North 82nd Street between North 80th Street and Bluff Street. On this block, Commonfields discharges raw sewage from a sanitary sewer overflow ("SSO") through a ditch, which flows to the Mississippi River and its tributaries (the "North 82nd Street SSO"), in violation of the Clean Water Act.[1] Toilet paper debris and the stench of sewage often accompany this discharge. As the raw sewage flows across and/or by these members' properties, it emits noxious odors and poses serious health hazards. Members of Centreville Citizens for Change are unable to enjoy spending time in their yards or hosting friends and family because of the sewage pollution.

---

[1] The term "sanitary sewer overflows" ("SSOs") refers to discharges of raw sewage from a sewage system.

27.     In addition, the raw sewage that Commonfields discharges from the North 82nd Street SSO flows to and through the Grand Marais Lake in the Frank Holten State Park. Members of Centreville Citizens for Change previously used Grand Marais Lake for fishing and for other recreational activities, but many no longer fish at this lake or recreate there because of the ongoing sewage pollution. If the sewage pollution problems were corrected, members of Centreville Citizens for Change would again use Grand Marais Lake for fishing and other recreational purposes.

28.     A declaratory judgment and an injunction requiring Commonfields to immediately stop the unpermitted discharge of raw sewage through Centreville and to comply with the Clean Water Act will redress the injury being suffered by Centreville Citizens for Change.

## IV.  Individual Plaintiffs

Although all Individual Plaintiffs are also members of Centreville Citizens for Change, the Individual Plaintiffs bring claims in their individual capacities.

### A.     Walter Byrd

29.     Plaintiff Walter Byrd is sixty-four (64) years old and has been a Centreville, Illinois resident for decades. Mr. Byrd has lived at ███████████████████████ ██████████ with his wife, Ms. Sandra Byrd, for over twenty-five (25) years. Mr. and Ms. Byrd also have ten (10) grandchildren who live with them. Although retired, Mr. Byrd works odd jobs in the local community to provide a modest income for his family. The multitude of issues at Mr. Byrd's home reveal the layers of the Defendants' inoperable and dysfunctional systems that the Defendants have long allowed to fester. For the last ten (10) years, Mr. Byrd and his family have been experiencing stormwater flooding and sewage backups and overflows during

both dry and rainy weather. The most recent flooding and sewage backup event occurred in
March 2021.

30.     Specifically, during both dry and rainy weather, the Defendants' defunct sanitary
sewer systems have resulted in the inability to flush and/or use the toilets in Mr. Byrd's home,
creating sewer backups in and outside of the home, and near his front door and side yard where
human waste, feces, urine, and toilet paper exit his home and remain stagnant. (See Figure 1).



*Figure 1: Sewage at Mr. Byrd's residence in March 2019.*

31.     Additionally, the area of Mr. Byrd's yard where human waste exits from
Defendants' sewer systems cannot be accessed or used due to the recurrent contamination of
human waste. Mr. Byrd experiences ongoing sewage backups that include feces, urine, and toilet
paper from Defendants' sewage systems. Mr. Byrd has been unable to utilize sections of his
property for several years. His yard is plagued by the continuous smell of sewage, stagnant water
mixed with sewage, and mosquitoes. During the summer, he and his family keep all their
windows closed in the home to keep mosquitoes out of the home, which requires running the air
conditioner nonstop and significantly increases their electric bill. When planning to be outside

for any length of time in the summer, Mr. Byrd and his family wear long sleeve shirts or jackets to prevent bites from the mosquitoes that hurt and burn.

32.     During rain events, the water in the neighborhood can get as high as two (2) feet and brings with it not only the smell of sewage, but fish, such as carp, that are believed to come from the nearby Frank Holten State Park. When the water is as high (or higher) than two (2) feet, Mr. Byrd, his family, and surrounding neighbors are unable to leave their respective homes until the stormwater recedes. Mr. Byrd owns a boat that he keeps on his property to rescue his family and neighbors should they need to leave the area when the water gets too high. It can take several hours for water to recede and three (3) to four (4) weeks for water in ditches to go down if there is no rain in the interim. (See Figure 2)



*Figure 2: Flooding on ███████████████ in September 2018.*

33.     Stormwater and/or raw sewage has backed up into Mr. Byrd's home, yard, and/or street over the last ten (10) years.

34.     Additionally, Mr. Byrd has been unable to utilize much of his property throughout the last ten (10) years due to the ongoing odor and presence of sewage and the significant attraction of mosquitoes due to these conditions.

35.     In the 1990's, Mr. Byrd would frequently fish in Grand Marais Lake for bass and catfish, and his family would eat his catch. Today, Mr. Byrd fishes much less frequently in Grand Marais Lake. When he does fish in the lake, he no longer eats the fish because he is now aware that Grand Marais Lake is polluted from the North 82nd Street SSO.

36.     Mr. Byrd has sought Defendants' assistance and resolution of the stormwater and sewage issues over the last several years, including calling both Defendants and the local health department (Eastside Public Health District). To date, none of these entities have resolved these conditions resulting from Defendants' defunct sewer systems.

37.     No ongoing precipitation is required for raw sewage and/or stormwater to backup or stand in Mr. Byrd's yard, home, or surrounding ditches.

38.     These backups, standing and stagnant water, and raw sewage issues that have taken over Mr. Byrd's home and yard for years are due to recurrent flooding from Defendants' sewage systems and Cahokia Heights' stormwater systems.

**B.     Lester Goree**

39.     Plaintiff Lester Goree is a military veteran and retiree from the United States Postal Service. He has lived at his home at ██████████████████████████████ ████████████████ since 2007. Over the course of the fourteen (14) years that Mr. Goree has lived in his home, his property has suffered from stormwater flooding approximately seven (7) times each year since 2007.

40.     Mr. Goree describes ███████████ as a "river" when it floods. His home has been severely damaged by the repeated invasion of stormwater, specifically his crawl space and front porch and steps which have nearly collapsed, sunk, and, crumbled and for several years, making access to his front door nearly impossible.

41.     Mr. Goree's home is situated at the corner of ██████████████ where two (2) ditches controlled, owned, and within the jurisdiction of Cahokia Heights run parallel to each other. Instead of carrying water to a larger ditch, these ditches have remained clogged with mud, unmown grass, trash, and old pipes, lacking maintenance by Cahokia Heights for numerous years, allowing stormwater to flood the streets and Mr. Goree's property and home. (See Figure 3).



*Figure 3: Flooding at the corner of ████████████████████████████ on June 30, 2020.*

42.     When it rains, the Cahokia Heights' drainage ditches and canals overflow and lead to recurrent flooding of Mr. Goree's home and property. These stormwater flooding events have caused Mr. Goree to miss or be late to work numerous times while waiting for the water to recede, which can take several hours and sometimes several days.

43.     Mr. Goree also owns the lot next to his property, which is ███████████.

44.     He has been unable to rent the home on this lot for the last several years due to severe damage to the foundation and walls from the stormwater flooding. This area of ██████ ██████ often smells like sewage, particularly during the summer.

45.     In addition, Mr. Goree used to fish at Grand Marais Lake quite often but has not been fishing at the lake for some time because of the raw sewage contamination from the North 82nd Street SSO. Mr. Goree would like to be able to spend more time fishing in the lake but cannot because of the contamination.

**C.     William McNeal**

46.     Plaintiff William McNeal is sixty-nine (69) years old and has been a resident of Centreville, Illinois for decades. He has lived at ████████████ since 1977 when he and his late wife first purchased the home. Prior to 1977, Mr. McNeal and his late wife lived in nearby East St. Louis where they were one of many families forced to move for the construction of Interstate 255.

47.     In the late 1980's, Mr. McNeal began to experience stormwater flooding and soon after, sewage issues.

48.     In addition to the stormwater that floods and saturates the foundation of his home, the North 82nd Street SSO, an open sewage discharge controlled by Commonfields, sits in a ditch next to Mr. McNeal's home; this SSO has run raw sewage continuously for years into this ditch

and under Mr. McNeal's home. (See Figures 4, 10-12, and 14). The open sewage makes it nearly

impossible for Mr. McNeal to sit in his yard or use his yard in any meaningful way or as

intended due to the constant sewage that flows in the ditch nearby and the smell and mosquitoes

that accompany it. For example, Mr. McNeal enjoys gardening and growing vegetables in his

yard, but the raw sewage on his property and the smell makes that activity much less pleasant

and prevents him from doing much gardening.



*Figure 4: North 82nd Street SSO, including ditch, in Centreville, Illinois on April 24, 2021.*

49.     The recurrent stormwater flooding, from Cahokia Heights' drainage systems, has invaded Mr. McNeal's home such that the water has shifted his home's foundation, caused the floors in his home to buckle, slanted the floors throughout the home, and created issues with mold in certain parts of the home. Mr. McNeal has been without a working furnace for three (3) years since stormwater that entered the home, from Cahokia Heights' drainage systems, destroyed his last furnace.

50.     Mr. McNeal frequently has sewage backups in his toilet and bathtub.

51.     Mr. McNeal estimates he has encountered two (2) to three (3) stormwater flood events per year since the late 1990s to date, with the most recent occurring on or about May 2021. (See, e.g., Figure 5).



*Figure 5: Flooding near* ███████████████████████ *on June 30, 2020.*

**D.** **Delores Saffold-Crigler**

52.     Delores Saffold-Crigler and her late husband moved into ████████████

████████████     in 1986.

53.     Over the last ten (10) years, the stormwater and sewage issues have increased in

frequency and severity in her home and around her property. In the last ten (10) years, there have

been at least five (5) stormwater flooding events per year. The most recent flood event occurred

in May 2021. During the May 2021 flooding event, four (4) to five (5) inches of water from

Defendants' systems invaded Ms. Saffold-Crigler's basement – this is the least amount of water

that typically enters her home.

54.     Every time her home floods, the stormwater, which smells like sewage, invades

her basement. Ms. Saffold-Crigler's basement was previously used as a room for her three (3)

boys and a living space. Several stormwater flooding events eventually destroyed the items in

her basement. She has been unable to use the basement as a living space for the last ten (10)

years.

55.     The stormwater flooding also creates issues of safety, making it impossible for

Ms. Saffold-Crigler and her adult children, who sometimes live with her, to leave the home due

to the volume of stormwater in the street. This also means there have been numerous times both

Ms. Saffold-Crigler and her children have been unable to get to work because of the stormwater

flooding. Sometimes, if rain is predicted, her son will park his truck a distance away from the

home and walk back to ensure he can get to work, should it rain and flood their home and nearby

area.

56.     Additionally, Ms. Saffold-Crigler deals with sewage issues inside and outside of

her home. Raw sewage often comes up in the backyard. A long, wide piece of plyboard is placed

17

over this portion of the yard to keep the waste from spreading throughout the yard. Sewage overflows also occur inside of the home in the basement, bathtub drain, toilets, bathroom, and kitchen sinks. The most recent sewage overflow occurred in May 2021. When it comes to eliminating the sewage smell in the home, Ms. Saffold-Crigler is rarely ever able to completely rid her home of the odor, and uses lime outdoors and air fresheners inside to "just give us some breathing space."

### E.    **Barbara Eiland**

57.    Plaintiff Barbara Eiland has lived at ███████████████████████ since 1981. She worked in healthcare for over thirty (30) years until she retired in 2009. Since 1983, Ms. Eiland, who is currently seventy-four (74) years old, has continued to deal with stormwater flooding and sewage issues.

58.    Since the 1980s when she first began experiencing flooding issues, it has flooded approximately ten (10) to fifteen (15) times per year and frequently created instances that have prohibited her from getting to work.

59.    With her house positioned at the corner of ███████████████████, Ms. Eiland's home withstands most of the stormwater that is supposed to channel through one of Cahokia Heights' many drainage ditches, but, instead, rushes under her home or floods the street in front of her home.

60.    When it rains and floods her home, the stormwater typically invades her crawl space, where the water sits under her home for extended periods and rusts the pipes, erodes her foundation, and results in buckled floors in the home. Retired due to medical issues, Ms. Eiland attempts to repair these problems as much as she can on her limited income.

F.     **Sharon and Bobby Smith**

61.     Plaintiffs Sharon and Bobby Smith own their home located at ███████████
████████████. Since 1988, the Smiths have lived in their home, and live there today with
their children, ages fifteen (15) and eight (8). Ms. Smith has worked for school district #189 in
East St. Louis for many years.

62.     Throughout the thirty-two (32) years that Mr. and Ms. Smith have lived in their
home, they have suffered repeated property damage and financial devastation due to ongoing
stormwater flooding and sewage overflows from the Defendants' systems.

63.     Mr. and Ms. Smith have experienced issues with stormwater flooding and/or
sewage backups at her home at least two (2) to three (3) times per year since 1989, and as
recently as March 2021.

64.     Each time it floods their home, the water is mixed with and smells like sewage.
The stormwater invades their home through the crawl space and ducts, settling under their home.
This infiltration and constant moisture create several issues, including the smell of sewage that is
difficult to eliminate, mold, and the destruction of numerous appliances, including furnaces and
air conditioning units.

65.     During a rain event in 2018, stormwater destroyed the air conditioning unit and
heating unit. The Smiths did not have a working heating unit for nearly two (2) winters after that
event and still do not have air conditioning.

66.     No ongoing precipitation is required for issues with sewage backups to occur at
Mr. and Ms. Smith's home, such as the inability to flush the toilets and/or sewage backing up in
the bathtub. These events occur during wet and dry weather.

G.     **Yvette Lyles**

67.     Plaintiff Yvette Lyles has lived in and owned her home at ██████████████ ████████████████ for twenty-eight (28) years.

68.     Over the last several decades, Ms. Lyles' home has flooded from stormwater an estimated three (3) to four (4) times each year, with the most recent stormwater flooding event occurring in March 2021.

69.     The frequency and depth of the stormwater flooding is such that Ms. Lyles' young grandchildren, who frequently visit her, have been fearful of drowning when it rains near her home. Small or heavy rainfall amounts flood Ms. Lyles' home, resulting in damage to her home, including but not limited to: damage to the foundation, buckling floors, walls, ceilings, and the loss of countless furnaces, hot water heaters, washers and dryers, and personal items. In addition to the stormwater that floods her street, crawl space, vents, and ducts of her home when it rains, the water also carries an odor of sewage.

70.     The sewage odor permeates Ms. Lyles' home and is difficult, if not impossible, to eliminate. The mix of the stormwater with sewage creates odor and contamination issues on Ms. Lyles' property and in her home. She uses fungicide and bactericide to sanitize her home and property so that she and her young grandchildren do not get ill.

71.     The stormwater flooding from Cahokia Heights' drainage systems has damaged her home and her property such that that she is unable to use portions of her front and backyard. Due to contamination from the sewage and sinkholes created by the flooding, the foundation is no longer level, making it difficult for Ms. Lyles to use her walker around the home, and she has also lost countless appliances due to the stormwater invading her home. She has been without heat in her home since 2019 due to damage to her furnace from the flooding.

72.     Additionally, Ms. Lyles has previously been trapped in her home and offered rescue by boat by local emergency agencies. Her children sometimes travel to Centreville to take her from her home to stay with them until the water recedes. (See Figure 6). This has happened at least ten times throughout the years. Other preventative measures employed by Ms. Lyles include using sandbags near the foundation of her home to prevent stormwater from entering the home and calling Cahokia Heights for assistance. To date, Ms. Lyles has not received assistance from the Defendants.



*Figure 6: Boat rescue on* ███████████████████ *during flooding on or about September 2018.*

21

73.     In addition, Ms. Lyles has been affected by the North 82nd Street SSO because the sewage pollution from this discharge has caused her to stop fishing in Grand Marais Lake. Ms. Lyles used to regularly fish at this lake with her family, as well as picnic by its banks. Ms. Lyles stopped fishing and eating lake fish, and stopped her other recreational activities at the lake, after she began smelling sewage and becoming concerned about sewage contamination.

**H.     Patricia Greenwood**

74.     Plaintiff Patricia Greenwood is seventy-one (71) years old. She and her husband Lonnie have lived at ███████████████████████ for over two (2) decades and have raised their school-age son there.

75.     Their house is the childhood home of Ms. Greenwood that was previously owned by her father. She and her husband have experienced severe flooding and/or sewage issues at least two (2) to three (3) times per year at their home since the early 1990s. (See Figure 7).

76.     As recently as March 2021, a flooding event resulted in water invading the Greenwood's backyard, garage, floorboards underneath the bathroom, and a back bedroom.

77.     Every time it rains, the Greenwoods notice an overwhelming sewage odor that is difficult to eliminate from both indoors and outdoors. After a rain event, this stormwater, which is often stagnant and does not drain, frequently draws gnats, and plagues their home. These conditions prevent the Greenwoods from hosting visitors at their home.

78.     Ms. Greenwood has called Defendants multiple times to remedy the flooding. Specifically, the Greenwoods called Commonfields in the summer of 2019 concerning issues with their bathroom pipes. When they flushed their toilet, it would back up into their bathroom sink or bathtub. Despite Commonfields' assurance that the issue would be investigated, no work or investigation was completed by Commonfields to resolve the issue.

22



*Figure 7: Flooding in Piat Place in front of* ████████████████████ *on June 30, 2020.*

**I.**   **Leon Spruell**

79.      Plaintiff Leon Spruell has resided at his home located at ████████████ ██████████████ for forty (40) years. He has three (3) grandchildren, aged twelve (12), eight (8), and seven (7), each of whom continue to visit him on a regular basis and who enjoy playing in his front and backyard.

80.      Approximately four (4) to five (5) times a year, concurrent with standard rainfall, Mr. Spruell experiences heavy stormwater flooding in his backyard. The water produced by the flooding takes anywhere from two (2) to three (3) days to recede. Mr. Spruell estimates that the

flooding he routinely experiences began within the last decade and has increased in severity over time. One of the drainage ditches is located near Mr. Spruell's home.

81.     Mr. Spruell has observed substantial flooding plaguing his street and the streets near his home, including Belleview Avenue. Even after a small amount of rain, stormwater pools in the ditches that are owned and operated by Cahokia Heights, spills over from the ditches and overflows into residents' yards and the streets themselves.

82.     Because Mr. Spruell's home is located in close proximity to the North 82nd Street SSO, a major, open sewage discharge that runs nearly continuously, Mr. Spruell worries that even a minor malfunction with the pipe, in consideration with the increasing severity of the flooding he experiences, will pose a serious health and safety risk to him and his grandchildren.

83.     Mr. Spruell has also stopped fishing at Grand Marais Lake due to the sewage pollution there caused by the North 82nd Street SSO. Mr. Spruell had fished at that lake his whole life, since he was a little boy, but stopped catching and eating fish there after he learned of the sewage pollution entering the lake from the North 82nd Street SSO.

**J.     Mario and Tamara Gladney**

84.     Plaintiffs Mario Gladney and Tamara Gladney own their home at ███████ █████████████████████ and lived there for twenty-three (23) years.

85.     Throughout the twenty-three (23) years that the Gladneys lived on ███████, they experienced ongoing stormwater flooding and sewage issues that began in 2010 and 2018, respectively. When steady or heavy rain occurs, water invades their bathroom and their finished basement, which they had to completely rehab on more than one occasion so that the space could continue to be used as the living space it was originally intended to be. Mario and Tamera

24

Gladney estimate that the most recent flooding requiring renovations to the basement occurred in or about late 2019.

86.     The sewage issues plague their home with sewage backing up in their bathroom drain and the odor of sewage invading the home. Mr. and Ms. Gladney have invested a lot of years, resources, money, and time constantly repairing their home because of these ongoing floods and overflows from the Defendants' defunct systems.

87.     Additionally, there is stagnant water resulting from the frequent flooding that pools on their street and around their home, creating a breeding ground for mosquitoes. This makes it impossible to spend time in their yard or much time outside on the property due to swarms of mosquitoes that constantly linger.

88.     In early 2020, Mr. and Ms. Gladney could no longer afford the constant repairs and the unending invasions from Defendants' defunct systems to their home and had to move. Mr. and Ms. Gladney still own and maintain the home.

### K.     Hattie Ivy

89.     Plaintiff Hattie Ivy has owned and lived at ███████████████████ ██████████████ for over forty (40) years. Ms. Ivy's house began flooding in the early 1970s. Because of this, a sump pump was installed in Ms. Ivy's basement in the late 1990s. This pump runs constantly because of the standing water in her basement. In the early 2000s, the flooding became so bad that Ms. Ivy contacted the Federal Emergency Management Agency ("FEMA") for assistance.

90.     Ms. Ivy has experienced flooding numerous times over the years, including in 2015 when her late mother required urgent medical attention, but stormwater flooding did not allow the ambulance to reach her home.

25

91.     As a result of this flooding, her family can no longer use the basement as a living space.

92.     The stagnant stormwater that is almost always present in her yard has led to a huge increase in mosquitoes. Because of the mosquitoes, frequent flooding, and stagnant water, Ms. Ivy is unable to enjoy her yard.

93.     Although Ms. Ivy has contacted local and city government officials, such as Lamar Gentry, who occupies multiple financial and administrative roles for the former City of Centreville and Village of Alorton, officials have not been responsive.

**L.      Sheila Gladney**

94.     Centreville resident Plaintiff Sheila Gladney is seventy (70) years old and lives at ███████████ with her husband, Quedell Gladney. Originally her childhood home that her parents purchased in the 1960s, she and her husband moved into the home in 2012. Their home has suffered from stormwater flooding for decades, but the flooding has become more frequent and severe in recent years.

95.     The constant flooding creates cracks in her foundation, constant water and moisture in her basement, and an odor of sewage in her home that she cannot fully eliminate. Ms. Gladney has invested a considerable number of resources, time, and money in repairing her home and cleaning her property from the sewage that comes with the stormwater.

96.     Ms. Gladney lives in constant fear when rain is forecasted. Heavy rain has left them trapped in the home days at a time and sometimes reliant on rescue by boat. Mr. Gladney's recent toe and leg amputations make Ms. Gladney even more fearful of the rain due to difficulty of reaching medical personnel to exit during a flood, and neither Mr. Gladney nor Ms. Gladney know how to swim.

97.     The family cannot use their yard because the stagnant water leads to terrible mosquitoes and snakes. The family dog almost drowned in the water that had pooled in their yard. This led to the Gladneys rehoming their dog because they felt that they could no longer keep him safe. These reasons, including the odor of sewage, constant moisture, and suspicion of mold in their home, prevents the Gladneys from inviting guests to their home, and enjoying their home and property as intended.

**M.     Joan Dancy**

98.     Plaintiff Joan Dancy is sixty (60) years old and resides at ███████████████ ████████████. She has owned her home for six (6) years and grew up across the street where her childhood home, built by her father in the 1950s, once sat on that very lot. Torn down in the 1980s, her childhood home is no longer across the street, but on that same lot is a newer home where her eighty-five (85) year-old mother now lives.

99.     Ms. Dancy moved back to Centreville to take care of her aging parents, but shortly after she moved back, she became ill. Ms. Dancy has serious medical conditions and relies on disability benefits for income. She lives in constant fear of rain. Ms. Dancy often worries that her mother's caretaker will be unable to access the street because of the stormwater flooding. Because of her health, Ms. Dancy is unable to cross the street to check on her mother.

100.    Due to her own health conditions, Ms. Dancy is frequently hospitalized and worries that paramedics will be unable to reach her, or her aging mother, due to the severity of the flooding that they experience. Should there be a need to evacuate due to the heavy rain, Ms. Dancy would struggle to do so due to her inability to swim, her mobility issues, and her oxygen tank.

101.    When it rains, her street is so terribly flooded that cars cannot pass for up to five (5) days at a time. Some drivers choose to drive in the yards and lawns of the homes on her street to avoid the water on the road.

102.    This stormwater also pools in Ms. Dancy's yard. Ms. Dancy describes it as having a fishy odor. There are low spots on Ms. Dancy's lawn where water can settle for weeks, and the standing water attracts snakes and mosquitoes. Due to these ongoing issues with the stormwater flooding, stagnant water, and snakes and mosquitoes, Ms. Dancy has been unable to enjoy her yard since moving to her home six (6) years ago.

**N.  Michael and Patricia Johnson**

103.    Plaintiffs Michael and Patricia Johnson are both seventy (70) year-old retirees. They have lived at ███████████████████████████ since 1980. Mr. and Ms. Johnson have lived in their home for decades, which has allowed them to see the decline in the Defendants' systems.

104.    There has been constant stormwater flooding on their property and street since the 1990s.

105.    Specifically, in 1993, water invaded their home during a stormwater flooding event. This stormwater flooding event severely damaged their foundation.

106.    Heavy rainfall creates other problems for the Plaintiffs Johnsons that make it difficult for them to use and enjoy their property, including the inability to drive on their street – this can be for several days until the water recedes. These flooding events have also prohibited the Johnsons from visiting their grandchildren and from hosting family and guests due to the inability to leave or access their home.

107.    Mr. and Ms. Johnson also experience sewage issues. For example, a manhole located in their yard that is part of Cahokia Height's sewage system discharges sewage during moderate to heavy rainfall. At times, the couple will see solid human waste and toilet paper discharging from this manhole and floating in their yard and in the street.

108.    During rain events, the Johnsons cannot flush their toilets for days at a time and have gone without a working toilet in the home for several days and have had to rely on a portable toilet.

109.    The stormwater flooding also leads to stagnant water in their yard, which attracts mosquitoes and other pests. As a result, the Johnsons are unable to use these parts of their yard.

110.    Mr. and Ms. Johnson have called Defendants to request assistance for these issues with their defunct systems throughout the years, as well as spent money from their retirement funds to repair damage to their home from Defendants' systems.

**O.   Vanessa Marion**

111.    Plaintiff Vanessa Marion is sixty-three (63) years old and has lived at ███████████ █████████████████████ for over twenty (20) years. Since living here, her home has flooded at least ten (10) to fifteen (15) times. Ms. Marion began experiencing stormwater flooding issues in her home two (2) to three (3) years after moving into the home.

112.    Unaware that Defendants' systems were defunct, she arranged her basement as a living space with furniture, carpet, and a seating area. Each time it rained moderately or heavily, her basement would flood with an estimated one (1) to two (2) feet of stormwater from Defendants' systems. The stormwater takes from two (2) to three (3) days to recede in her basement, and it carries a strong sewage smell, ruining the living space Ms. Marion created. Ms. Marion would continue to replace these items and recreate in the living space in the basement

until a 2007 stormwater flooding event destroyed the space. Because of this, Ms. Marion has not been able to use her basement as a living space since 2007 and is unable to use the basement as a storage space for items of value due to frequent stormwater flooding.

113.     Due to consistent stormwater flooding from Defendants' systems, the foundation of Ms. Marion's home has eroded, she has lost three (3) washers and dryers, multiple deep freezers, hot water tanks, and several furnaces.

114.     Frequent flooding has caused mold to grow in Ms. Marion's home and required constant use of bleach to eliminate the mold. Ms. Marion also deals with the frequent smell of sewage around her property.

115.     The stormwater flooding Ms. Marion experiences also includes the streets in front of her home which has prevented her from leaving her home for several hours.

116.     Ms. Marion has spoken to numerous representatives of Defendants about the sewage and stormwater flooding issues, including former Centreville Township Supervisor, Curtis McCall Sr., who is the current mayor of Cahokia Heights, and LaMar Gentry, former City of Centreville Tax Incentive Finance Administrator, but received no assistance.

### P.  **Carolyn and Maurice Taggart**

117.     Plaintiffs Carolyn and Maurice Taggart are both sixty-six (66) years old. The couple have owned their home located at ███████████████████████ for twenty (20) years. They raised two (2) children in the home and continue to use it as a family house.

118.     Beginning in 1983, stormwater flooding has occurred at their property at least four (4) times per year, with the water taking at least twenty-four (24) hours to recede and sometimes up to three (3) days.

119.    Mr. and Ms. Taggart missed work countless times because of stormwater flooding and the inability to leave their home. There were also times they needed to be rescued by boat. The frequency of being unable to get to their jobs finally left them with the decision to move in 2003. Notably, the Taggarts' have been paying two (2) mortgages until very recently when they paid off their home at ███████████████ .

120.    When it floods at their home, the water sits in the crawl space, the garage, and under the floorboards, buckling their floors.

121.    Currently, Mr. Taggart's sister lives at the home and experiences the same stormwater flooding and sewage issues. Mr. Taggart's sister keeps a bag packed and ready in the trunk of her car based on the three (3) occasions she has needed to leave the home due to flooding.

122.    The Taggarts also experience problems with their plumbing and HVAC unit due to Defendants' systems. For example, their toilets often do not flush when it rains and at times, they have been completely unable to use the toilets.

123.    Additionally, Mr. and Ms. Taggart's yard has a manhole that is part of Cahokia Height's system that discharges sewage when it rains. A sewage smell and toilet paper would often accompany the discharge from this manhole. The sewage smell is also in the home, and the stagnant water from the stormwater and sewage sitting in their yard and under their home attracts pests, including snakes.

124.    The Taggarts have invested much of their resources, time, and money into repairs of their home to eliminate the uncomfortable conditions created by the stagnant stormwater and sewage, which has included seeking loans and purchasing another home.

31

**Q.  Leichue Hych and Lakesha Ware**

125.    Plaintiff Leichue Hych bought a home located at ███████████████ ████████████ in 2002, and she lived in the home for seventeen (17) years with some of her children and grandchildren. No longer able to use the home as a residence because of the recurrent sewage backups and stormwater flooding that created mold and foundation issues, and that destroyed portions of her home, including but limited to the flooring in her bedroom, living room, kitchen, and bathroom, Ms. Hych moved out of the home on August 13, 2019. Her daughter Lakesha Ware now owns the home, but Ms. Hych continues to pay the mortgage on the property, which remains in her name.

126.    By the time Ms. Hych and her family moved out of the home, the house was visibly leaning. When Ms. Hych walked down a hallway, she felt like she was almost walking sideways. Ms. Hych moved out of the home in 2019 after a flood knocked over her hot water heater.

127.    Ms. Hych, her children, and grandchildren experienced stormwater flooding during rain events every year that they lived in her home on ████████████████. Each time it rained, stormwater would rise in front of the home and fill some portion of the front and backyard, as well as her driveway.

128.    During some of these flood events, the waters were so deep that the backyard looked like a lake. Ms. Hych, who cannot swim, was often fearful of drowning in the home when the water would surround her property. Ms. Hych was often trapped in the house until the waters receded, which sometimes took up to two (2) days. It was not unusual for Ms. Hych to lose electricity and heat during stormwater flooding.

129.    Stormwater often reached the crawl space underneath Ms. Hych's home, sitting there for weeks at a time, causing rot, mold, and foundational problems. Upon lifting some of the floorboards in the home to replace the flooring, water could be seen sitting immediately underneath the floor, so close that you could reach down and touch it.

130.    Although living on a fixed social security income, Ms. Hych replaced the floors in her home approximately twice a year every year because the floors would continuously rot, buckle, and fall. At times when Ms. Hych did not yet have the money or resources to replace the flooring, she would block holes in the floor with boards to prevent people from walking in dangerous areas. Each time Ms. Hych replaced the floors it cost her approximately $800 to $1,000.

131.    Additionally, Ms. Hych was unable to use her laundry room. The floors in that room were also unstable because of damage from the stormwater. Due to the constant moisture from the stormwater, mold also grew on the laundry room walls and the walls could be seen separating from the floor. Similarly, in the bathroom and bedrooms, the baseboards began pulling away from the floors.

132.    Ms. Hych also experienced sewage backups in the home, including in her toilet and kitchen sink. The toilet would often not flush for days on end, and sewage would bubble up in the kitchen sink and refuse to drain.

133.    Sometimes these backups would resolve themselves after a few days, but on one occasion, the backup never stopped. This incident involved sewage spilling out of Ms. Hych's toilet into the bathroom. A plumber was hired to snake the toilet and kitchen sink. After snaking the pipes as far as possible and finding no blockage, the plumber informed Ms. Hych that the

problem was not with Ms. Hych's plumbing but stemmed from the Defendants' sewage systems. As a result, Ms. Hych was left with a toilet and kitchen sink that remained in disrepair.

134.    The sewage smell within the home was often strong. Ms. Hych would wake up with headaches and nausea after sleeping because of the foul odor. The stormwater also smelled of sewage. Sewage could be smelled by the family outside of the home even during dry and sunny weather.

135.    All these issues combined, the ongoing sewage smell, stagnant stormwater that attracted pests such as mosquitoes, and frequent stormwater flooding, made it not only impossible for Ms. Hych to enjoy her home and property as intended, such as hosting family and friends or simply sitting in her yard, but impossible for her to live in her home due to Defendants' defunct systems.

### R.  <u>Mary Anthony</u>

136.    Plaintiff Mary Anthony is from Centreville, Illinois. Both her mother, Leola Green, and sister, Jeanette Green, remain in Centreville and own homes there with similar issues that will be described herein.

137.    Ms. Anthony owns her home at ███████████████████████████ and has lived there since 1987 with her husband. Ms. Anthony is sixty-two (62) years old and has worked as a paralegal at a legal services organization for twenty-two (22) years.

138.    The flooding in her neighborhood has been widespread and severe. For example, the flooding rose so high in 2015 that she could not see the grass in her backyard. Ms. Anthony has also seen her neighbors require rescuing from their homes after extreme flooding left them stranded. She has also seen cars get stuck in ditches they could not see due to the flooding.

139.     The stormwater ditches and sewers owned and operated by Cahokia Heights in Ms. Anthony's neighborhood are regularly clogged. When there are heavy or constant rains, the ditches and drains will overflow and flood her backyard, the nearby streets, and the surrounding neighborhood. Ms. Anthony's husband has attempted to clear out the drains near their home, but without much success. Once, Ms. Anthony's husband asked a state of Illinois employee who was removing a downed tree to use his backhoe to clear the drains, but the drains were so clogged that the employee was unable to finish clearing them.

140.     Ms. Anthony has also experienced issues with sewage in her yard. On or about June 6, 2021, sewage began bubbling in Ms. Anthony's backyard. She could identify it as sewage because she could see toilet paper. She was worried that when the weather gets hotter that her backyard would begin to smell like sewage.

141.     In 2007, Ms. Anthony finished her basement to use it as a family room, bedroom, and laundry room. After a heavy rain the following year, her basement flooded with a foot and a half of water. While Ms. Anthony and her husband pumped the floodwater out of the basement after that first flood event, during the next rain her basement flooded once more. After that event, her basement has flooded each time there is a heavy or constant rain. The basement also floods after big snow melts, which occurs at least once a year.

142.     Every time her basement would flood, everything in the basement would be ruined. Over the past thirteen (13) years, Ms. Anthony and her family have accumulated more than $3,000 in damage due to ruined furniture, desks, equipment such as a lawn mower and vacuums, computers, televisions, and clothes, among other personal belongings. Over the years, the walls became riddled with mold and the carpet was ruined. Due to the damage to the basement and their belongings, her family was unable to use the bedroom and family room at all.

35

Out of necessity they continued to use the laundry room, but needed to repeatedly scrape mold off the walls and repaint to use their washer and dryer.

143.    Ms. Anthony and her husband have made unsuccessful attempts throughout the years to prevent their basement from flooding, but finally in October 2020 they hired a contractor to waterproof their entire basement, which cost $12,500.

## S.  Leola Green

144.    Plaintiff Leola Green has owned and resided in her home of forty-seven (47) years, located at ███████████████████████. She raised three (3) children, including Plaintiffs Mary Anthony and Jeanette Green, in this home. Ms. Green has experienced flooding and water intrusions, as well as sewage backups, for approximately fifteen (15) years. At eighty-six (86) years old, Ms. Green has been forced to make extensive repairs to her home due to the repeated flooding on her property.

145.    The stormwater ditches in front of Ms. Green's home are shallow and often filled with dirt, grass, and old pipes left by Defendants in an abandoned attempt to replace the ditches. These ditches owned by Defendants are not maintained, and Ms. Green has not seen anyone clean or dredge the ditches.

146.    When there are heavy rains, the stormwater ditches overflow and the water floods her yard. Since water is not draining as it should through Cahokia Heights' stormwater ditches, water also enters her property through a wooded area behind her home. She observes that at least half of her one (1) acre property floods during these heavy rains. The floodwater collects under her house in her crawl space for about three (3) to five (5) days until it dries up. Heavy rains occur on average every two (2) weeks during the spring, but also happen during the fall.

147.    The repeated flooding has caused the foundation of her home to crack and crumble, which she first noticed in approximately 2007. After a cat entered her home through the cracked foundation, Ms. Green filled the cracks with foam and put down wooden boards. The flooding also damaged her front and back doors, windows, the floors of her bathroom, kitchen and hallways, the toilet, sink, tub and door of her bathroom, and the cabinets of her kitchen.

148.    In 2010, Ms. Green applied for a grant with the St. Clair Intergovernmental Grants department for a portion of the damages to her home. However, the department informed her that they could not provide her with a grant to cover the necessary repairs to her collapsed foundation, and that the grant funds she was allowed to receive were not enough to cover the replacement of the bathroom door.

149.    Unfortunately, the flooding continued and steadily began to undo the repairs done to Ms. Green's home. After only six (6) years, the same areas of her home began to deteriorate once more. The kitchen floor is currently unstable and in need of repair. Her back door will no longer close fully, and the storm door is damaged. The condition of the bathroom door that was not repaired is worse. In 2018, Ms. Green attempted to reapply for a grant to repair her home and was told that she would not be eligible to reapply for another twelve (12) years.

150.    Ms. Green has also experienced problems in her bathroom with sewage. Her toilet and bathtub are regularly clogged. She must plunge her toilet about once every one (1) to two (2) months, and the bathtub drains very slowly.

**T.   <u>Jeanette Green</u>**

151.    Plaintiff Jeanette Green lives at ███████ ██ ████████████████████. She has lived and raised her son in her home for twenty-one (21) years. Ms. Jeanette Green lives next

door to her mother, Ms. Leola Green. Ms. Jeanette Green has worked as a receptionist for twelve (12) years. She is sixty-one (61) years old.

152.     Ms. Jeanette Green experiences the same stormwater flooding from Defendant Cahokia Height's stormwater ditches as her mother, Ms. Leola Green. When there are heavy rains, the stormwater ditches in front of her home overflow and flood her yard. The water collects under her house for about three (3) to five (5) days, particularly under her main bathroom and adjoining hallway. Even after the water dries up, the floor of Ms. Jeanette Green's bathroom and hallway remains wet. The flooding has also damaged the floor of her utility room where she does laundry.

153.     About five (5) years ago, Ms. Jeanette Green noticed that the floor in the main bathroom, hallway leading the bathroom, and utility room were getting wet. The floors remain wet even after the water has receded. In the last five (5) years, the floors have begun to crumble, which created a hazard in her home. For example, Ms. Anthony, Ms. Jeanette Green's sister, has been afraid to walk near the bathroom due to the unstable condition of the floor.

154.     Four months ago, Ms. Jeanette Green replaced the floors in the bathroom and hallway. When she was replacing the floor, mold was found around the toilet and behind the cabinets. Unfortunately, she has not been able to afford replacing the floor in her utility room, so she has temporarily placed boards across the crumbling floor to avoid anyone falling.

155.     Ms. Jeanette Green has also experienced sewage backups in her main bathroom. About ten (10) years ago, sewage started to backup out of her toilet. Initially, the sewage would not go down, but gradually the issue became worse. When it rained, Ms. Green could see sewage come out of the toilet. It was at its worst in 2020, when more sewage was coming up out of the toilet. Ms. Jeanette Green tried plunging and draining the toilet with a snake, but the issue did not

not resolve. Approximately four (4) months ago, she replaced her toilet. While the sewage no longer backs up into her toilet, it continues to drain slowly, and she still needs to plunge the toilet often.

### U.  **Vittorio Blaylock**

156.     Plaintiff Vittorio Blaylock is sixty-seven (67) years old and he and his wife, Rose, reside at ███████████████████████. Mr. Blaylock moved into his home in 2004. Mr. Blaylock's father recommended the property because it was located just down the street from his own home. Mr. Blaylock was also drawn to the area because of the low cost of living. Unfortunately, Mr. Blaylock has been unable to enjoy the full benefits of his property due to recurrent issues related to flooding and raw sewage discharge around and underneath his home. Further, the repairs he has had to make have been costly, causing him to take on a manual labor job despite being previously retired.

157.     Only a few short months after moving into his home, during the spring of 2004, Mr. Blaylock experienced the first of many floods. The flood overwhelmed the storm ditches in front of his home. Approximately two (2) inches of rainwater inundated most of his front yard and part of his driveway, and completely submerged the first of the steps leading to his front door. When Mr. Blaylock attempted to flush his toilet, he noticed that the water would not drain. He lifted the entrance to the home's crawl space and observed that it was completely flooded.

158.     During the 2004 flood, Mr. Blaylock discovered that, underneath his home, there was an inoperable furnace, completely submerged under the water that flooded the home's crawl space. Before he discovered the furnace, Mr. Blaylock did not believe that there was a furnace for the home because one of the prior owners had mounted heating units throughout the walls of the house. Because the furnace was submerged in water, even though the prior owners had

installed a concrete trough and pump system, Mr. Blaylock spent thousands of dollars to replace the furnace, and placed the new furnace in the attic to avoid similar damage.

159.     Every time it rains, water pools in Mr. Blaylock's crawl space. The water does not evaporate fully, so his crawl space constantly stays damp. This has led to his floor joists rotting and his floors buckling. Mr. Blaylock has recently replaced the wooden floorboards in one bathroom with treated plywood. He is anxious about replacing a portion of the floor in his main sitting room because he is unsure whether it will be futile, given the constant water damage the floorboards face when his crawl space floods.

160.     Currently, Mr. Blaylock experiences routine flooding in the south side of his front yard. About once a year, the cap on Mr. Blaylock's cleanout system pops off due to system pressure, causing raw sewage to overflow onto his yard. Mr. Blaylock and his wife often notice the smell of sewage outside their home and in their yard. The floodwaters and sewage also attract mosquitoes, making it difficult for them to enjoy time in their yard.

161.     The flooding extends to other portions of Mr. Blaylock's property. In order to make his driveway accessible, Mr. Blaylock has installed approximately seventy-five (75) yards of concrete in his driving area. He has also put about 100 tons of lime down in his backyard to prevent his horse from getting hoof infections by walking through the muddy and often water-logged ground.

162.     The constant flooding has damaged Mr. Blaylock's street to a point where part of the road is caving in. After a heavy rainfall, one end of the street is inaccessible. Due to his heart condition, Mr. Blaylock worries that an ambulance would waste precious minutes going around the block to reach his house.

163.    Mr. Blaylock has called Commonfields to remedy the flushing issues with his toilets but has received no assistance. Mr. Blaylock attended meetings held at City Hall to inform city officials such as Mayor Jackson about his flooding and sewage issues. In 2014, as a precinct committeeman, he tried to find resolutions for the sewage and flooding issues. He ultimately stepped down from the precinct committeeman position when he realized that City officials were not remedying the flooding and sewage issues.

**V.  Allene Hopkins**

164.    Plaintiff Allene Hopkins is an eighty (80) year-old retiree and has lived in Centreville, Illinois for more than forty-three (43) years. Ms. Hopkins owns a home located at ███████████████████████. Ms. Hopkins acquired the home in or about 1978 or 1979, which she completely rehabbed on a modest income with support from friends and church members. Ms. Hopkins raised her ten (10) children and cared for her ailing mother until her passing in the home. Though Ms. Hopkins continues to own her ████████████ home today, she moved out of the home in June 2021, due in part to concerns about recurrent sewage backups and chronic flooding, which were amplified because Ms. Hopkins is physically disabled and requires the use of wheelchair.

165.    Ms. Hopkins' home has experienced two (2) to three (3) raw sewage backups a year for at least the last twenty (20) years during both rainy and dry weather, but especially after heavy rains. At times, the toilet would often not flush for days, and sewage would bubble up from the sinks, the bathtub, and the drain standpipe connected to the washing machine. When sewage backups occurred, they would typically last anywhere between three (3) days and a week, at which point Ms. Hopkins (or her children) would hire private plumbers to snake the drains to try to alleviate the backup. The most recent sewage backup in Ms. Hopkins' home

occurred in November 2020; two (2), separate, private plumbing companies came and inspected

the lines at Ms. Hopkins' home to investigate the source of the November 2020 sewage backup.

After snaking the lateral pipes all the way to the main line and finding no blockage, and after

inserting cameras into the drain, both companies informed Ms. Hopkins that the problem was not

with Ms. Hopkins's plumbing but stemmed from the Defendants' sewage system. As a result,

they were unable to fix the issue. Ms. Hopkins paid approximately $1,200 for these services. Ms.

Hopkins has suffered damage to walls and flooring in her bedroom, bathroom, and living rooms

when sewage overflowed from the drain standpipe connected to her washing machine that abuts

her laundry room, which required her to repair and replace the drywall in her bedroom. The most

recent sewage overflow at Ms. Hopkins' property occurred in approximately late 2019 or early

2020.

166.    Ms. Hopkins has experienced chronic flooding of her property whenever it rains

for a sustained period every year that she lived in the home on ███████████, since roughly

1981, but the flooding has worsened over the years due to Cahokia Heights' defunct stormwater

system. Each time it rained steady for at least a few hours, floodwaters would rise on ██████

█████ and rise high enough to overtake Ms. Hopkins's driveway and yard and make the roads

surrounding her home impassable. If it would rain for more than a few hours or a day, the

floodwater would completely engulf her yard and driveway, and flood the entire interior of her

home.

167.    During some of these flood events, water as high as three (3) feet deep would

enter inside her property. Each time these floodwaters came, Ms. Hopkins was either trapped in

her home until the waters receded or she had to leave her home for extended periods of time

while the home underwent extensive repair. Depending on the severity of the event, Ms. Hopkins

42

could be trapped for as little as a few hours to a week in the home, or she might have to leave her home for months at a time. When there is flooding in the area, Ms. Hopkins' medical assistants have difficulty reaching her home to provide her with critical medical support. At other times, and for extended periods, Ms. Hopkins' aides are unable to access the backyard to empty trash because of standing floodwater.

168.     Ms. Hopkins' friends, family, or neighbors have had to evacuate her from her home due to encroaching floodwaters on at least twenty (20) occasions. Because of Ms. Hopkins' physical disability and inability to swim, any time it rained, she and her children lived in fear that she might be trapped in her home by floodwaters – or worse that she would drown in her home – so they kept a vigilant watch on the weather during the rainy season. Ms. Hopkins even kept an emergency overnight bag at her bedside in case she ever had to make a quick escape. The most recent flooding of her property occurred in approximately spring 2020; at that time, the water was up to her front porch and Ms. Hopkins' son had to evacuate from her home using his personal vehicle. Ms. Hopkins recalls that on one occasion the flooding on her property was so severe that she had to be evacuated by boat from her home by the Midway Fire Department.

169.     Floodwaters have entered Ms. Hopkins' home on at least five (5) separate occasions, causing total devastation of her home, yard, and personal property over the last thirty (30) years.

170.     Due to the flooding in her home, Ms. Hopkins has been forced to clean out and completely renovate her home on at least three (3) occasions; the repairs include but are not limited to mold and mildew remediation, and repairing or replacing drywall, studs, fixtures, and flooring. In addition, after each such occurrence, Ms. Hopkins had to replace all the appliances

and furnishings in the home, including but not limited to the refrigerator, stove, washing machine and dryer, dish washer, water heater, furnace, furniture, clothing, and other home furnishings. Ms. Hopkins has maintained homeowner's insurance, but she has been unable to obtain flood insurance for her home; every time Ms. Hopkins tried to obtain flood insurance, she was unable to, either because insurance carriers in the area are unwilling/unable to insure the home against flooding or because of the cost. Ms. Hopkins and her family estimate that collectively they have expended over $100,000 repairing and restoring Ms. Hopkins' home on ███████████ over the years due to damages caused by flooding and sewage.

171.     While some of the belongings Ms. Hopkins lost could be repaired or replaced, other items, like a photograph book containing the only pictures of her parents that she owned, heirloom Bibles, and a newspaper clipping Ms. Hopkins brought with her from her hometown paper in Mississippi decades ago, were irreplaceable.

172.     The floodwaters smell like sewage, and Ms. Hopkins and her family could smell sewage outside of the home even during dry weather. Due to the sewage smell and stagnant water, there was also a severe mosquito problem in the area.

173.     Ms. Hopkins and her family used to enjoy having family gatherings on the patio in the backyard, but due to the flooding, that is no longer possible because the backyard has been so inundated with floodwater over the years.

174.     Ms. Hopkins and her family have spoken to numerous representatives of Defendants about the sewage and stormwater flooding issues in her home, including former Centreville Township Supervisor, Curtis McCall Sr., who is the current mayor of Cahokia Heights, the former Mayor of the City of Centreville, Marius Jackson, and others, but received no assistance.

175.     Ms. Hopkins moved out of her home in July 2020, partially because her family was concerned that it was no longer safe for her to live at the home on ▮▮▮▮▮▮▮▮ because of the chronic flooding and recurrent raw sewage backups in her home.

## LEGAL BACKGROUND

## I.  <u>Clean Water Act</u>

176.     The Clean Water Act was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). Before the Clean Water Act was enacted, "[r]ivers, lakes, and streams [we]re being used to dispose of man's wastes rather than to support man's life and health," and the use of rivers, lakes, and streams in such a way was deemed "unacceptable." S. Rep. No. 92-414, at 3674 (1971). The Clean Water Act declared that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated . . ." 33 U.S.C. § 1251(a)(1).

177.     As one means of achieving that objective, section 301 of the Clean Water Act prohibits "the discharge of any pollutant by any person" absent a National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311(a).

178.     The term "discharge of a pollutant" means "any addition of any pollutant to navigable waters [of the United States] from any point source." 33 U.S.C. § 1362(12).

179.     The term "pollutant" specifically includes, among other things, raw sewage. 33 U.S.C. § 1362(6). Sewage itself contains additional pollutants, including but not limited to oxygen depleting substances, fecal coliform, microbial pathogens, and nutrients.

180.     The term "person" means "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

181.     The term "navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

182.     The Clean Water Act defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

183.     Under section 505(a)(1) of the Clean Water Act, any citizen may commence a civil action against any person alleged to be engaging in the unpermitted discharge of a pollutant. 33 U.S.C. § 1365(a)(1).

184.     In an action brought under section 505(a) of the Clean Water Act, the Court has jurisdiction to order the Defendant to comply with the Act and to assess civil penalties under section 309(d) of the Act, 33 U.S.C. § 1319(d). *See* 33 U.S.C. § 1365(a).

185.     Section 309(d) of the Clean Water Act provides that any person who violates section 301 of the Act, 33 U.S.C. § 1311, shall be subject to a civil penalty, payable to the United States, per day for each violation. 33 U.S.C. § 1319(d). The Court may assess a penalty of up to $56,460 per day for each violation. *See* 40 C.F.R. § 19.4, Table 1.[2]

---

[2] The penalty amount of up to $56,460 per day is the applicable civil penalty amount under 40 C.F.R. § 19.4, Table 1 for violations assessed on or after December 23, 2020. The Centreville Citizens for Change's 60-day Notice Letter under the Clean Water Act erroneously stated that the applicable civil penalties could reach only $55,800 per day.

186.     Additionally, under section 505(d) of the Clean Water Act, the Court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d).

## II.  Federal and Illinois Takings Clauses

187.     The Fifth Amendment to the United States Constitution provides in relevant part that private property shall not be taken for public use without just compensation. U.S. Const., amend. V. This "takings clause" is applicable to the states, and to their political subdivisions, via the Fourteenth Amendment.

188.     The state of Illinois' constitution also contains a takings clause. The Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law." Ill. Const. 1970, art. I, § 15.

## III. Private and Public Nuisance

189.     Illinois allows for claims of private nuisance and public nuisance.

190.     "'A private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land.'" *City of Evanston v. Texaco, Inc.*, 19 F. Supp. 3d 817, 825 (N.D. Ill. 2014) (quoting *In re Chicago Flood Litig.*, 680 N.E.2d 265 (1997)). A nuisance is "'something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable.'" *In re Chicago Flood Litig.*, 680 N.E.2d at 278 (quoting *Rosehill Cemetery Co. v. City of Chicago*, 185 N.E. 170 (1933)). "[A]llegations that the defendant's conduct threatens the plaintiff's land with environmental contamination are sufficient[] [to] state a nuisance claim." *City of Evanston*, 19 F. Supp. 3d. at 825 (citing *Vill. of Wilsonville v. SCA Servs., Inc.*, 426 N.E.2d 824, 836–37 (Ill. 1981)). "[A] private nuisance that interferes with a public right can

47

also constitute a public nuisance." *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 132 (Ill. App. 3d. 2005).

191.     An action for a public nuisance can exist even where there is not an interference with private property rights. *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1111 (Ill. 2004). A public nuisance is the "doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public." *Id.* at 1113 (internal citation omitted). A claim for public nuisance is based on "an unreasonable interference with a right common to the general public." *Id.* at 1111 (citing Restatement (Second) of Torts § 821B (1979)).

192.     The elements of a public nuisance claim are: (1) the existence of a public right; (2) a substantial and unreasonable interference with that right by the defendant; (3) proximate cause; and (4) injury. *Id.* at 1113. A public right is a "right common to the general public[,]" which includes "the rights of public health, public safety, public peace, public comfort, and public convenience." *Id.* at 1114 (internal citation omitted). Interferences that are unreasonable include: conduct that "involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience"; conduct that is "proscribed by a statute, ordinance or administrative regulation"; or conduct that "is of a continuing nature or has produced a permanent or long-lasting effect" and which the actor knows or has reason to know interferes with the public right. *Id.* at 1116-17 (internal citation omitted).

**IV. Negligence**

193.     A defendant is liable for negligence when "'the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injury.'" *Doe v. Coe*, 135 N.E.3d 1, 12 (2019) (quoting *Krywin v. Chicago*

*Transit Authority*, 938 N.E.2d 440 (2010)). The Illinois Supreme Court has "long recognized that every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or proximity of relationship." *Id.* at 13 (internal quotations omitted). "At common law, a municipality had a duty to maintain its property in a safe condition." *Tzakis v. Berger Excavating Contractors, Inc.*, 142 N.E.3d 288, 316 (*aff'd in part*, *rev'd in part on other grounds sub nom. Tzakis v. Maine Twp.*, 2020 WL 6788163 (Nov. 19, 2020)) (internal quotations omitted). Moreover, "[i]t has long been the law of this State that a municipality has a duty to refrain from discharging sewage onto private property." *Porter v. Urbana-Champaign Sanitary Dist.*, 604 N.E.2d 393, 397–98 (1992) (internal citations omitted).

194.    "Legal cause 'is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct.'" *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502–03 (Ill. 1992) (quoting *Masotti v. Console*, 552 N.E.2d 1292 (1990)). Foreseeability is an objective, not a subjective test. "[T]he question is not what the individual defendant herself thought would be the likely result of the alleged negligent conduct. Rather, the question is what a *reasonable person* would see the likely result to be." *Stanphill v. Ortberg*, 129 N.E.3d 1167, 1177 (2018) (internal citations omitted) (emphasis in original).

195.    A claim for negligence based on the doctrine of res ipsa loquitur ("the thing speaks for itself") is based on two factors: the plaintiff was injured "(1) in circumstances that ordinarily would not occur absent negligence, [and] (2) by an agency or instrumentality within the defendant's management or control." *Smith v. United States*, 860 F.3d 995, 998 (7th Cir. 2017) (internal citations omitted).

49

## V.  Negligent Trespass

196.     A defendant is liable for trespass when the defendant has engaged in "negligent or

intentional conduct . . . which resulted in an intrusion on the plaintiff's interest in exclusive

possession of land.'" *Chessie Logistics Co. LLC v. Krinos Holdings, Inc.*, 2016 WL 7034101, at

*2 (N.D. Ill. Dec. 2, 2016), *aff'd*, 867 F.3d 852 (7th Cir. 2017). "[O]ne can be liable under

present-day trespass for causing a thing or a third person to enter the land of another either

through a negligent act or an intentional act." *Tzakis*, 142 N.E.3d at 318. Negligent trespass, as

opposed to intentional trespass, is "governed by the general principles of negligence . . . ." *Dial

v. City of O'Fallon*, 411 N.E.2d 217, 220 (1980).

## FACTUAL BACKGROUND

## I.  Commonfields' Sewage System is Failing.

### A.  Commonfields does not have a Clean Water Act permit and does not routinely inspect nor maintain its sewage system.

197.     Commonfields is a person under the Clean Water Act. Commonfields does not

hold a NPDES permit authorizing discharges of sanitary sewage or combined sewer overflows

under the Clean Water Act.

198.     Commonfields owns and operates a municipal sanitary sewer system that contains

more than forty (40) miles of gravity sewers ranging in size from eight (8) to eighteen (18)

inches in diameter, more than 3,000 feet of force mains, more than 900 manholes, and twenty-

seven (27) lift stations.

199.     As of January 2020, Commonfields had no inspection or routine maintenance

program. On information and belief, Commonfields still does not have an inspection or routine

maintenance program as of the date of this Complaint.

50

200.     According to Dennis Traiteur, Commonfields does not have a systematic inspection or maintenance program, but rather inspects on an as needed basis. On information and belief, Dennis Traiteur lacks any certification for operating sewer systems. According to comments made by Dennis Traiteur to the U.S. EPA inspectors in February of 2021, he is the only person on Commonfields' staff with sufficient training and experience in sewer operations and maintenance.

201.     Commonfields' budget typically does not include funds in anticipation for emergency repairs or capital investments to improve its sewer systems.

**B. Commonfields' sewage system has deteriorating pipes, broken lift stations, and allows the inflow of stormwater and infiltration of groundwater.**

202.     Following August 5, August 26, and September 9, 2020, inspections of Commonfields' system by the Illinois EPA, the Illinois EPA noted and informed Commonfields of the following observations: that the system's concrete sewer mains were in deteriorated conditions, that there were severe inflow and infiltration problems, and that there were inoperable lift stations.

203.     The problems of stormwater and groundwater entering sewer systems is referred to as inflow and infiltration, respectively.

204.     Lift stations are pumps that move sewage from lower elevations to higher elevations in a sewer system when gravity would not otherwise move the flow. Lift stations are also referred to as pump stations.

205.     Commonfields' system has twenty-seven (27) lift stations, approximately half of which have major functional problems. Lift station failures, as well as other infrastructure problems, can lead to backups and SSOs. The terms "backup" or "sewage backup" refer to

overflows of a sewer system in which raw or inadequately treated sewage emerges through toilets and drains into private homes or other buildings.

206.    One of Commonfields' failing lift stations is located at North 82nd Street and Bluff Avenue. When the U.S. EPA inspected this station on January 26, 2021, the electrical panel was uncovered, indicating poor maintenance. Until recently, Commonfields operated this lift station manually. On information and belief, the manual operation of this lift station involves the dispatch of maintenance staff approximately three (3) times per week to pump sewage water to a higher elevation. Unsurprisingly, this lift station floods chronically and has a history of operations and maintenance issues dating back to at least a decade ago. (See Figure 8). For example, in March of 2011, when one resident had been experiencing sewage backups for approximately a week, Commonfields discovered that this lift station had failed.



*Figure 8: Lift station at North 82nd Street and Bluff Street in Centreville, Illinois during a flood on March 30, 2019.*

207.     Commonfields' system allows stormwater and/or groundwater to regularly enter the system through manholes, broken pipes, or other means, overwhelming its capacity and causing problems such as SSOs, sink holes, and backups into homes.

208.     Dennis Traiteur and Curtis McCall, Sr., the Mayor of Cahokia Heights and former Board Chair for Commonfields, are aware of the inflow and infiltration. The Board of Commonfields has not allocated any funding to stop the inflow and infiltration. Until requested to do so by the Illinois EPA as part of a September 2020 pre-enforcement action, Commonfields had not performed a "smoke test," a test in which smoke is pumped into the system in order to identify leaks and breaks, or any other diagnostic tests to identify breaks in the sewer lines.

**C.  Commonfields' broken sewage system regularly discharges sewage.**

209.     Commonfields' sewage system routinely discharges sewage in multiple locations and from various sources throughout Centreville.

210.     For example, Commonfields' system sometimes discharges sewage via manholes, as occurred on June 30, 2020, near 73rd Street in Centreville. (See Figure 9). A limited sampling of Commonfields' work orders includes at least eight (8) other instances of documented manhole discharges within the last ten (10) years.



*Figure 9: Manhole discharging sewage on June 30, 2020, near 466 North 73rd St. in Centreville, Illinois.*

211.    Commonfields does not routinely inspect its system to identify SSOs, and often learns about SSOs from resident complaints or from employees if they happen to see an SSO. Commonfields does not document or report all SSOs, even though the Illinois EPA requires sewage system providers to notify the agency of SSOs within twenty-four (24) hours and to submit a written report to the agency within five (5) days.

212.    For more than a decade, Commonfields has discharged raw sewage from the North 82nd Street SSO, a ditch and a pipe spewing sewage on the block of North 82nd Street between North 80th Street and Bluff Street, into waters of the United States.

213.    The North 82nd Street SSO is essentially a fountain of sewage spilling from Commonfields' sewage system on a nearly daily basis, even during dry weather conditions. The

SSO is located in an otherwise peaceful neighborhood, where retirees, families, and children are forced to see and smell sewage. The discharge, as depicted in Figures 10-12, below, is a fast-flowing stream of sewage. At times, the SSO leaves a trail of toilet paper debris in the flow of the sewage stream.



*Figures 10-12: Dry weather sanitary sewer overflow at North 82nd Street in Centreville, Illinois on March 30, 2021, January 26, 2021, and June 26, 2019, respectively, from left to right.*

214.    Other reported SSOs from Commonfields' system include, but are not limited to, the following recently documented discharges:

    a.    SSO from a lift station in disrepair at Lauralee Drive and Violet Drive observed by the U.S. EPA during an inspection on January 26, 2021. (See Figure 13). The raw sewage from this SSO flowed to a field. The manhole cover at this lift station was missing, exposing the station to rainfall, and the liquid level was just below the lip of the manhole on the date of the inspection. This lift station is not operational and the temporary submersible pump at the lift station is unable to

handle the flow from upstream pumps, according to a Commonfields employee.

The resulting discharges accumulate as ponded water next to the lift station.



*Figure 13: Sanitary Sewer Overflow on January 26, 2021, at lift station at Lauralee Drive and Violet Drive in Centreville, Illinois.*

    b.  SSO near Lake Drive Pill Box lift station at the rear of 7100 Park Place, observed by the U.S. EPA during an inspection on February 24, 2021.

    c.  SSO on unknown dates from the Greystone Apartments lift station, observed, and reported to the U.S. EPA by the maintenance manager of the Greystone Apartments. The Greystone Apartments maintenance manager told the U.S. EPA inspector that she has seen the Greystone Apartments lift station overflow a couple of times and that the overflow travels downhill to a children's playground.

215.    Sewage backups into homes and discharges into residential streets and yards frequently occur within Commonfields' service area. For example, from mid-May 2019 through mid-February 2020, sewage discharges occurred at multiple addresses within Commonfields'

service area each month. Moreover, a sampling[3] of approximately 1,500 of Commonfields' sewer system work orders from 2012 to 2019 reveals an alarming number of sewage backups and overflows from manholes and other sources in residential streets, as well as instances of sewage flowing into homes and yards, toilets not flushing, and a collapsed street:

a.  On or about May 2, 2019, Commonfields was notified that the sewer was backing up and bubbling out of a manhole at 4739 Pearl Avenue.

b.  On an unknown date in 2017, Commonfields was notified that the sewer was backing up at 200 North 62nd Street.

c.  On or about September 15, 2017, Commonfields was notified that the sewer was backing up between 4754 and 4758 Tudor Avenue.

d.  On or about June 19, 2017, Commonfields was notified that there was a lot of water coming up on North 82nd Street.

e.  On or about June 6, 2017, Commonfields was notified that the sewer was backing up at the 200 block of North 63rd Street.

f.  On or about May 10, 2017, Commonfields was notified that sewage was bubbling out of a manhole in an alley in the 7100 block of Park Place.

g.  On or about May 3, 2017, Commonfields was notified that the sewer was backing up in the street at Market Street at 53rd and 54th Streets.

_____

[3] These work orders were obtained by Plaintiffs through public records requests. The cited work orders are a small sampling of the work orders, and there may be additional work orders from this time period that were not produced to Plaintiffs. For example, only two work orders were provided for the year 2019, and five work orders were provided for the year 2018, compared with hundreds of work orders provided for some prior years. During that time period, there is no record of any system-wide repairs or other available information that could explain the massive drop in the number of work orders. Not all work orders indicate who notified Commonfields of the problem that led to the work order; those that do show that residents, local business staff, and the local drinking water company were some of the notifying parties.

h.  On or about December 28, 2016, Commonfields was notified that there was water coming up in the middle of the street out of a manhole near 82nd and Bluff Streets.

i.  On or about August 29, 2016, Commonfields was notified that the sewer was backing up at Market Street at 53rd and 54th Streets.

j.  On or about July 18, 2016, Commonfields was notified that there was water coming out of a manhole near 300 North 82nd Street.

k.  On or about January 20, 2016, Commonfields was notified that the sewer was backing up at 53rd and Market Streets.

l.  On or about August 31, 2015, Commonfields was notified that sewage was in the street and there was a large hole in the street at 82nd and Bluff Streets.

m.  On or about June 9, 2014, Commonfields was notified that the street was full of water at 54th and Market Streets.

n.  On or about April 24, 2014, Commonfields was notified that a portion of the street was collapsed by a lift station at 82nd and Bluff Streets.

o.  On or about January 10, 2014, Commonfields was notified that the toilets were not flushing at 75th Street.

p.  On or about August 22, 2013, Commonfields was notified that sewage was backing up in the middle of the road at 54th and Market Streets.

q.  On or about August 1, 2013, Commonfields was notified that water was coming up in the middle of the road in the 5300 block of Church Road.

r.  On July 18, 2013, Commonfields was notified that sewage was coming out of a manhole at the 300 block of North 82nd Street.

s.   On or about July 17, 2013, Commonfields was notified that on North 85th Street sewage was backing up into a backyard and basement.

t.   On or about July 12, 2013, Commonfields was notified that sewage was coming out of a manhole between Kathryn and Edna streets.

u.   On or about June 24, 2013, Commonfields was notified that sewage was backing up in the street between South 53rd and South 54th Streets.

v.   On or about May 16, 2013, an employee or agent of Commonfields identified that there was raw sanitary sewage behind a home on North 74th Street because the sewer lines were down.

w.   On or about May 15, 2013, Commonfields was notified that the Mary Ryans lift station was down and a manhole near the area was "surcharging."

x.   On or about December 7, 2012, Commonfields was notified that water was coming out of the sewer in the middle of the street at 54th and Market Streets, and the street was flooded.

y.   On or about August 6, 2012, Commonfields was notified that the sewer was bubbling up again at the 6100 block of Church Road.

z.   On or about July 13, 2012, Commonfields was notified that sewage was "jumping up" at 54th and Market Streets.

aa.   On or about April 2, 2012, Illinois American Water called Commonfields to notify them the sewer was leaking where Illinois American Water was fixing a water main break at or near North 81st Street and Bluff Street.

bb.   On or about February 28, 2012, Commonfields was notified that the sewer was backing up at 54th and Market Streets.

cc. On or about January 31, 2012, Commonfields was notified that sewage was coming out of a manhole at Market Street between 54th and 53rd Streets.

**D. The failures of Commonfields' system have been widely known for years.**

216.     Residents within Commonfields' jurisdiction have been complaining about sewage problems since at least 2003, and the Illinois EPA has investigated sewage overflow and backup complaints from Commonfields customers since at least 2010, notifying Commonfields of the problems during these investigations. For example, on July 26, 2010, the Illinois EPA documented a complaint regarding the North 82nd Street SSO and contacted Commonfields about the SSO at that time. In 2011, the Illinois EPA received a formal complaint from a Centreville resident who experienced sewage backing up into his home over the course of approximately one week in March, due to broader backups in the Commonfields sewer system. In response to this complaint, Commonfields told the resident to have his connection line cleaned and to send the bill to Commonfields. The Illinois EPA recorded another complaint on October 8, 2012, regarding raw sewage standing in the street for at least two and a half days at a redacted location in Centreville, discharging approximately 18,000 gallons of sewage. Commonfields was aware of this incident and reported it to the Illinois EPA as an SSO.

217.     The Illinois EPA has previously inspected Commonfields' sewage system. On April 17, 2013, the Illinois EPA inspected Commonfields' system and discovered "breaks/separation in sewer lines, dropped manholes, temporary bypasses and sewage bubbling up at one location . . . at various points along the system." Around this same time, the Illinois EPA met with Commonfields to discuss the "several complaints" it had received regarding its sewage system. At this meeting, the Illinois EPA representatives and a manager of Commonfields discussed problems with "bypasses, collapsed manholes, etc." Commonfields

further reported that in November of 2011, it hired an engineering firm to prepare a design package to make system repairs, but Commonfields' board did not approve funding for any of the work. More recently, as discussed further below, the Illinois EPA inspected Commonfields' system again in 2020.

218.    Although the Illinois EPA has never pursued an enforcement action against Commonfields, the agency has sent multiple violation notices to Commonfields, putting the utility on notice about its sewage system failures.

219.    In addition to two (2) earlier violation notices sent in 2012, in 2013 the Illinois EPA sent a violation notice to Commonfields for SSO violations at the following locations throughout its system: Illinois Route 157 and Calvin Blvd., Lakewood Place, 221 Elm Street, 45 Dora Drive, Judith and Amelia Streets, Lauralee and Violet Drive, 6320 Church Road, and 219 North 82nd Street. In the violation form, the Illinois EPA noted that overflows, bypasses, and complaints had been occurring "with regularity" in 2012 and 2013. In 2015, Commonfields submitted an update to the Illinois EPA regarding the status of each of the sewage overflow locations that were the subject of the 2013 violation notice and reported that there were remaining repair tasks to complete at all of the locations, including some where the nature of the problem had not even been identified. Although Commonfields' work orders and invoices indicate some limited repairs may have been completed at two of the locations listed in the 2013 violation notice, and some repairs were conducted at a third location that did not fix the problem, the current status of repairs at the remainder of the locations identified in the 2013 violation notice is unknown. As discussed further below, the Illinois EPA sent an additional violation notice to Commonfields in September of 2020.

## II.  Commonfields' Sewage System is Discharging Raw Sewage on North 82nd Street to Waters of the United States.

220.    The sewage from the North 82nd Street SSO discharge, from the ditch and pipe on North 82nd Street, travels through the ditch along the front and west sides of a residence on North 82nd Street. From the ditch, the discharge flows to Canal #1, then Harding Ditch, and then Prairie duPont Creek, which flows directly into the Mississippi River. In addition to this direct flow path from Canal #1 to Harding Ditch, Canal #1 also flows into Grand Marais Lake (also known as Frank Holten Lake #3), which also flows into Harding Ditch. In other words, Canal #1 splits and flows into both Grand Marais Lake and Harding Ditch, and the flow paths recombine in Harding Ditch and continue downstream to the Mississippi River.

221.    The ditch and pipe on North 82nd Street, and Canal #1, are point sources.

222.    Canal #1 is a perennial tributary and a water of the United States.

223.    Grand Marais Lake is a lake and a water of the United States.

224.    Harding Ditch is a perennial tributary and a water of the United States.

225.    Prairie duPont Creek is a perennial tributary and a water of the United States.

226.    The Mississippi River is a river and a water of the United States.

227.    Canal #1, Grand Marais Lake, Harding Ditch, Prairie duPont Creek, and the Mississippi River have a designated use of primary contact recreation under the Clean Water Act, meaning that they are supposed to be clean enough for recreational activities such as swimming.

228.    Unfortunately, the recreational use of these waters, as well as their ability to support aquatic life, has been compromised. Unlawful levels of pollutants associated with raw sewage – fecal coliform and phosphorous – have previously been reported at Harding Ditch and Grand Marais Lake, respectively.

62

229.     The U.S. EPA recently tested a sample of water from the ditch on North 82nd

Street. The test results showed levels of fecal coliform ninety-seven (97) times higher than

Illinois' water quality standard for fecal coliform – an astronomically high number that

endangers nearby residents and other members of the public each day.

230.     The North 82nd Street SSO has occurred on a nearly continuous basis for years, is

presently ongoing, and will continue into the future, unless this Court orders remedial action.

231.     Below is a non-exclusive list of discharges on North 82nd Street documented by

photograph or video by members of Centreville Citizens for Change, news media, other

members of the public, or the U.S. EPA or the Illinois EPA inspectors, or documented in the

records of the U.S. EPA, the Illinois EPA, or Commonfields:[4]

     a.   April 24, 2021: The sewage was discharging at the North 82nd Street SSO the day

        after Centreville Citizens for Change provided notice of the Clean Water Act

        violations to Commonfields. These photographs appear as Figures 14-15, below.

---

[4] This list of discharges, which is not exhaustive, is provided in reverse chronological order for the past five years.



*Figure 14: North 82nd Street SSO in Centreville, Illinois on April 24, 2021.*



*Figure 15: Flow of sewage discharge that originated at the North 82nd Street SSO in Centreville, Illinois on April 24, 2021.*

    b.   March 30, 2021: The sewage was discharging at the North 82nd Street SSO. A still photograph of this video appears as Figure 10 above.

    c.   March 18, 2021: The sewage was discharging at the North 82nd Street SSO and was videotaped.

d.  February 24, 2021: Inspectors with the U.S. EPA observed sewage discharging at the North 82nd Street SSO.

e.  January 26, 2021: Inspectors with the U.S. EPA observed raw sewage discharging from the North 82nd Street SSO into the ditch that ultimately flows into the Mississippi River. On the same day, a member of Centreville Citizens for Change videotaped the discharge. A still photograph of this video appears as Figure 11 above.

f.  January 25, 2021: A member of Centreville Citizens for Change observed the North 82nd Street SSO discharging raw sewage, and his observation was relayed to the Illinois EPA by email on January 26, 2021.

g.  November 30, 2020: The sewage was discharging at the North 82nd Street SSO and was videotaped.

h.  September 9, 2020: The Illinois EPA documented sewage discharging from the North 82nd Street SSO in a Notice of Violation sent to Commonfields on September 30, 2020.

i.  August 26, 2020: The Illinois EPA documented sewage discharging from the North 82nd Street SSO in a Notice of Violation sent to Commonfields on September 30, 2020.

j.  August 5, 2020: The Illinois EPA photographed sewage discharging from the North 82nd Street SSO, and the Illinois EPA documented this discharge in a Notice of Violation sent to Commonfields on September 30, 2020.

k.  February 20, 2020: The news source Fox 2 Now documented, including by video, discharges from the North 82nd Street SSO.

l.  February 18, 2020: The news source St. Louis Post-Dispatch documented, by video, a discharge at the North 82nd Street SSO.

m.  August 23, 2019: An employee of Illinois American Water noted multiple sewage discharges to a ditch at North 82nd Street in an email to the Illinois EPA.

n.  June 26, 2019: The sewage was discharging at the North 82nd Street SSO during dry weather conditions. A photograph of the discharge taken on that day appears as Figure 12 above.

o.  March 19, 2019: The sewage was discharging at the North 82nd Street SSO and was videotaped.

p.  May 23, 2018: The East Side Health District noted a discharge from the manhole at North 82nd Street and, in an email, described it as "shooting water with surfactant."

q.  June 19, 2017: A Commonfields work order noted a discharge from the manhole cover at North 82nd Street.

r.  December 28, 2016: A Commonfields work order noted a discharge from the manhole cover at North 82nd Street.

s.  July 18, 2016: A Commonfields work order noted a discharge from the manhole cover at North 82nd Street.

232.  Commonfields has known about the fountain of sewage at the North 82nd Street SSO since at least 2010. For example, on July 26, 2010, the Illinois EPA documented a complaint regarding the above-mentioned ongoing sewage overflow at North 82nd Street, which it described, at the time, as "occurring periodically over the past 2-3 years." During this 2010 investigation, the Illinois EPA collected a water sample from the ditch between the two homes

where this discharge flows, and the water sample notes indicate a "high flow rate." At the time, the Illinois EPA also contacted Commonfields, which was aware of the discharge.

233.    Members of Centreville Citizens for Change live in the area, experience the effects of the North 82nd Street SSO, and have observed the discharge on a nearly continuous basis for years. On information and belief, the discharge has ceased only occasionally in the last several years. Each time, it has resumed soon after.

234.    For example, in January 2021, Commonfields replaced a collapsed sewer on the stretch of North 82nd Street between the pipe on North 82nd Street and the lift station at the North 82nd Street and Bluff Street intersection. The planned repairs were completed as of January 22, 2021. At that time, the discharge had stopped. Three days later, during a meeting with the Illinois EPA on January 25, 2021, the Illinois EPA represented to Centreville Citizens for Change that the recent repair work Commonfields had done on North 82nd Street should be a permanent fix to that sewage discharge. That same day, however, a member of Centreville Citizens for Change observed the pipe on North 82nd Street overflowing with raw sewage, and the information was relayed to the Illinois EPA by email on January 26, 2021. On January 26, 2021, a member of Centreville Citizens for Change videotaped sewage discharging from that location (see Figure 11 above). On the same day, the U.S. EPA also observed and photographed the discharge. The discharge has continued to flow since then, stopping only occasionally, and then resuming. Until Commonfields' system-wide infrastructure problems are comprehensively addressed, this discharge will continue.

235.    Commonfields does not operate its sewer system in a manner that allows it to achieve regular compliance with the Clean Water Act.

236.     Each time Commonfields discharges sewage from its sewer system to waters of the United States, it violates the Clean Water Act.

237.     Plaintiffs are unaware of any planned change in Commonfields' operations that will eliminate future sewage discharges from North 82nd Street. On information and belief, Commonfields will continue to discharge sewage to waters of the United States after the date this Complaint is filed.

### III. Members of Centreville Citizens for Change are Harmed by Commonfields' Clean Water Act Violations.

238.     Members of Centreville Citizens for Change have endured the North 82nd Street SSO, and the corresponding smell of raw sewage, visual trail of toilet paper debris, and polluted waterways in their community for decades.

239.     Members of Centreville Citizens for Change have been unable to enjoy recreational activities such as entertaining friends or family in their yards because of the odor and appearance of raw sewage in their yards and neighborhoods. Moreover, the many mosquitoes attracted to the pools and ditches full of standing sewage throughout Centreville can transmit pathogens that may cause a variety of diseases in humans.

240.     Because of the raw sewage pollution in the Grand Marais Lake and Harding Ditch in the Frank Holten State Park caused by the North 82nd Street SSO, members of Centreville Citizens for Change have been unable to enjoy fishing in those waters. Some members of Centreville Citizens for Change used to fish in Grand Marais Lake much more frequently, and often with family or friends. Some members would cook and eat the fish they caught, but no longer eat the fish due to the sewage pollution. If they knew that there was no sewage pollution in the water, members of Centreville Citizens for Change would resume fishing.

241.    Moreover, raw sewage includes many different kinds of pathogens, including bacteria (such as E. coli), viruses (such as Adenovirus and Enterovirus), and parasites (such as Giardia and parasitic worms like hookworm). Humans can be exposed to these pathogens through aquatic recreation, contaminated drinking water, or skin contact or inhalation of pathogens in sewage in streets or lawns. Resulting ailments from these pathogens include diarrhea, vomiting, pneumonia, and hepatitis. Members of Centreville Citizens for Change who live near the North 82nd Street discharge are exposed to raw sewage in ditches in their yards or in neighbors' yards, or during flood events on North 82nd Street.

## IV. State and Federal Government Enforcement Actions Have Not Stopped the Sewage Discharges or Clean Water Act Violations.

242.    After being alerted to the sewage system's problems by Centreville Citizens for Change through the citizens' advocacy and the citizens' submission of an informal complaint to the Illinois Pollution Control Board, the Illinois EPA issued a violation notice pertaining to some of the Clean Water Act discharges alleged in this action on September 30, 2020. This violation notice was not brought in a court. See 415 ILCS 5/31(a)(1). The Illinois EPA neither brought an action in court nor before the Illinois Pollution Control Board, a state adjudicatory agency. Any actions taken under or as a result of this violation notice have failed to put a stop to the ongoing violations alleged in this action.

243.    Centreville Citizens for Change also informed the U.S. EPA of the sewage system's problems, and several months later the U.S. EPA issued information requests to Commonfields and inspected Commonfields' system. On April 30, 2021, the U.S. EPA sent Commonfields a notice of potential violation of the Clean Water Act. This notice of potential violation is a notice of a statutory violation and an opportunity to confer, and it did not involve an action in court. The U.S. EPA did not bring an action in court to address these violations. Any

actions taken under or as a result of this violation notice have failed to put a stop to the ongoing violations alleged in this action.

**V.  Cahokia Heights' Sewage System is Failing.**

244.    The newly formed municipality of Cahokia Heights was served by four sewage systems prior to the merger. As described above, Commonfields is responsible for some of the sewage collection in Cahokia Heights. The City of Centreville, Village of Alorton, and Village of Cahokia also operated sanitary sewage systems within their respective municipalities. Cahokia Heights is the successor to those three municipal sanitary sewage systems and now owns and operates those three systems.

245.    Cahokia Heights' sewage system has poorly maintained and inoperable equipment. The portion of Cahokia Heights' system formerly operated by the City of Centreville in Centreville has eight lift stations. In Centreville, at least two of the lift stations were inoperable as of April 1, 2021, and none of the eight lift stations have a function to alert staff remotely when a problem occurs. On occasion, the City of Centreville pumps sewage and/or stormwater from inoperable lift stations into nearby waterways. For example, on or about June 15, 2018, the Illinois EPA documented a complaint from a resident of Centreville about sewage being pumped from the lift station at 37th Street and Market Avenue to a ditch in that residential neighborhood. More recently, on February 1, 2021, for multiple hours, City of Centreville personnel pumped stormwater from a sewer lift station near 56th Street and Central Avenue to a wetland next to a residential neighborhood. The receiving wetland is located approximately one mile from Harding Ditch, a tributary to the Mississippi River. (See Figure 16).



*Figure 16: Pumping of stormwater by City of Centreville personnel from a sewer lift station near 56th Street and Central Avenue to a wetland next to a residential area in Centreville, Illinois on February 1, 2021.*

246.    Cahokia Heights' sewage system has severe inflow and infiltration problems. For example, in April 2019, the Illinois EPA noted that a Village of Cahokia stormwater retention pond was continuously overflowing its bank and that the stormwater infiltrates nearby manholes. In April 2021, during a U.S. EPA inspection, the Village of Cahokia Water and Sewer Department foreman noted that chronic backups near a particular sewer lift station were due to poor stormwater drainage during rain events exceeding two (2) to three (3) inches, and that during these times stormwater pools into yards, causes sewer lines in the area to fill with silt, and causes system backups to the point where residents cannot flush toilets. At another lift station located at 811 South 46th Street, a City of Centreville employee informed the U.S. EPA in April 2021 that stormwater runs from the surrounding parking lot and pools on top of the lift station, presenting an obvious risk of inflow and infiltration.

247.    Cahokia Heights' sewer system has a history of sewage overflows. The Illinois EPA, in letters to the former City of Centreville, has documented sewage overflows to ditches due to failing lift stations and leaking manholes from 2015 through 2018. In these letters to the City of Centreville, the Illinois EPA requested investigations of the following sewage complaints:

    a.  On or about February 3, 2015, and in September of 2014, there was sewage backing up into two separate residences, attributed to problems in the Centreville system.

    b.  On or about July 14, 2015, and for several months prior to July, there was stormwater and sewage standing in ditches on both sides of South 34th Street due to only "intermittent" operation of the lift station on the east side of South 34th Street.

    c.  On or about August 12, 2015, there were sewage overflows at homes near the Grand Marais Golf Course, flowing to a stormwater ditch and into a pond on the golf course.

    d.  On or about May 31, 2017, there were frequent sewage backups and sewage was discharging out of manholes at 201 and 303 Park Drive.

    e.  On or about January 4, 2018, and July 16, 2018, there was sewage standing in a ditch in the neighborhood of 37th Street and Market Avenue due to apparent backups in the lift station at that location, and/or heavy rains.

In these letters, the Illinois EPA requested written responses; however, there is no record of the former City of Centreville ever responding in writing.

248.     Cahokia Heights' sewage system has also had recent SSOs, including to a wetland. On both April 1, 2021, and April 21, 2021, when the U.S. EPA inspected the City's system, the U.S. EPA observed a dry weather SSO from a lift station at 42nd Street and Missouri Avenue ("lift station #5"). The flow path of the SSO from that lift station discharged to a downhill wetland, and there was sewage and sewage related debris, such as toilet paper, along that path.

249.     Also in April 2021, the foreman for the Village of Cahokia's sewage system informed the U.S. EPA that there were issues where residents could not flush toilets due to backups in the sewage system.

250.     Cahokia Heights' sewage system is understaffed. At least some staff members were also undertrained and lacked experience with sewage systems. For example, as of April 21, 2021, the Village of Cahokia had three workers to maintain both sewage and water systems in the Village, and the Village hired workers with no sewer experience who received on-the-job training. Following the merger, the understaffing problem has only worsened. As Mayor McCall indicated to the Belleville-News Democrat in an April 2021 interview, after the merger, all staff would have to re-apply for their positions, not everyone would be rehired, and those that were rehired would take a pay cut.

251.     Sewage overflows are likely to recur, especially in light of Cahokia Heights' inoperable equipment, inflow and infiltration problems, and understaffing.

## VI.  Cahokia Heights' Stormwater System is Also Failing.

252.     Cahokia Heights' stormwater system has persistent and unaddressed drainage problems. When the system cannot drain properly, flooding is more likely to occur because there is nowhere for the water to go.

253.    Some of the drainage problems stem from a faulty design. The portion of Cahokia Heights that was formerly the City of Centreville, for example, has no stormwater retention basins for management or control of stormwater.

254.    In addition, the former City of Centreville portion of Cahokia Heights has only one stormwater lift station, located at 5400 Sterling Street. The pump in this lift station is undersized and requires manual operation. As a result, former City officials do not use the pump, and allow stormwater to pool in the residential street where the inlets to the lift station are located. When the U.S. EPA inspected this lift station on April 1, 2021, a dry day, stormwater was standing in the street. During the inspection, a former City official told the U.S. EPA that residents must call the former City officials to ask them to pump out the stormwater from the street. When this occurs, former City officials will pump the stormwater approximately fifty (50) feet away to a gutter leading to a stormwater drain.

255.    Other drainage problems are due to poor maintenance. The drainage ditch system in the portion of Cahokia Heights that was formerly the City of Centreville is densely overgrown with trees and vegetation, demonstrating a historical lack of maintenance that reduces the capacity of the ditches to retain and transport stormwater.

256.    Pursuant to the federal Clean Water Act, the Illinois EPA regulates stormwater systems through a Municipal Separate Storm Sewer Systems ("MS4") permit program. The City of Centreville, Village of Alorton, and Village of Cahokia – Cahokia Heights' predecessor municipalities – participate in the MS4 permit program and are subject to a general permit for a group of St. Clair County co-permittees ("ILR400312"). As permittees, they are required to "develop, implement, and enforce a stormwater management program" that is designed to minimize water pollution.

257.    On August 5, 2020, the Illinois EPA inspected the City of Centreville's stormwater system pursuant to the MS4 program. At that time, the Illinois EPA noted that the City's permit had expired, and the City had failed to timely renew the permit. The Illinois EPA made several recommendations to the City of Centreville, including the following: to periodically remove trash and other debris from roadside ditches, and for staff to avail themselves of all possible training opportunities. The Illinois EPA also noted that there was no operations and maintenance document for the stormwater system – and one was needed.

258.    The City of Centreville is a party to an Intergovernmental Agreement ("IGA") with other state and local agencies to perform work on "the WPA Ditch and Canal #1" (attached as Exhibit C). As the City's successor, Cahokia Heights is now a party to this IGA. The WPA Ditch and Canal #1 serve stormwater drainage functions and are meant to carry water away from Centreville. The City of Centreville and the Metro East Sanitary District ("MESD") assumed responsibility for the maintenance of a portion of Canal #1 known as "Reach D." Per the IGA:

> [t]his maintenance will include, but not be limited to, keeping the PROJECT areas clean of all trash and other debris, or other matter that may tend to impede the proper and free flow of water, and the removal of sediment from the channel annually from where it has deposited and where it impedes the proper and free flow of water such that the capacity of the PROJECT will be maintained at the five year-frequency discharge and stage.

259.    The City of Centreville has not performed this maintenance work and the flow of Canal #1 is frequently impeded by debris and sediment, contributing to increased flooding in Centreville. In January 2021, after many years of neglect, MESD performed some maintenance on Canal #1; however, on information and belief, the City of Centreville and Cahokia Heights have not satisfied their responsibilities for keeping Canal #1 clean of trash, debris, sediment, or other matter that can impede the proper and free flow of water.

260.     On information and belief, Cahokia Heights and its predecessor City of Centreville also have not satisfied their responsibilities for keeping WPA Ditch clean of trash, debris, sediment, or other matter that can impede the proper and free flow of water. The City of Centreville has been reminded of its responsibilities for cleaning out the WPA Ditch since the IGA was reached, including by the Illinois Department of Natural Resources in March 2010, February 2016, and March 2018 (attached as Exhibit D). Cahokia Heights' predecessors, including Centreville, are parties to the Blue Waters Ditch Agreement, which commits the parties to fund and conduct work to maintain ditches designed to prevent flooding from stormwater in Centreville and the surrounding areas. Centreville has consistently failed to meet its obligations. For example, over the course of many years, it has failed to make its required payments under the agreement.

261.     Flooding is common in Cahokia Heights. For example, three significant floods that led to stormwater and sewage backups in Centreville occurred on January 11, 2020, June 30, 2020, and November 24, 2020.

262.     On information and belief, Cahokia Heights and its predecessor City of Centreville have received at least dozens of complaints from residents regarding the stormwater flooding, including requests for an emergency flooding communications procedure in order to secure assistance during floods.

## VII. The Sewage and Flooding Problems in Centreville Are Related.

263.     The U.S. EPA recognizes that municipal sewage and stormwater management are related. In 2012, the U.S. EPA released the Integrated Municipal Stormwater and Wastewater Planning Approach Framework, recognizing that a (voluntary) integrated plan to confront both

stormwater and sewage issues could be an efficient way "to achiev[e] the human health and

water quality objectives." And as recently as 2019, the U.S. EPA has reiterated this position.[5]

264.     Indeed, the sewage and stormwater infrastructure problems throughout

Centreville exacerbate each other and are inexorably entangled. For example, the rampant

flooding caused by the inadequate stormwater infrastructure results in more water entering the

sewer system through inflow and infiltration. This overloading of the sewage system in turn

contributes to the numerous overflows and backups in Centreville. Because there are frequent

sewage overflows and backups, the floods spread raw sewage around neighborhoods and into

yards and homes. This connected cycle of flooding and sewage overflows is responsible for the

devastating combination of flooding and sanitation problems experienced by many Centreville

residents.

## CAUSES OF ACTION

### Count 1: Violation of Section 301 of Clean Water Act - Claim for Declaratory Judgment
### (Plaintiff Centreville Citizens for Change Against Defendant Commonfields[6])

265.     Paragraphs 1 through 264 are re-alleged and incorporated by reference.

266.     For at least the past decade, Commonfields has routinely discharged, and

continues to routinely discharge, raw sewage from its sanitary sewer system through a pipe and

---

[5] *See* Memorandum from EPA Office of Enforcement and Compliance Assurance on Integrated
Municipal Stormwater and Wastewater Planning Approach Framework to EPA Regional
Administrators (June 5, 2012), https://www.epa.gov/sites/production/files/2015-
10/documents/integrated_planning_framework.pdf; EPA Integrated Planning in Action (last
visited July 20, 2021), https://www.epa.gov/sites/production/files/2021-
04/documents/ip_facsheet_thebasics.pdf.
[6] Plaintiff Centreville Citizens for Change intends to seek leave to amend this Complaint to add
Cahokia Heights as a Defendant in Count 1, as Commonfields' successor, after Commonfields is
dissolved.

ditch on North 82nd Street into a ditch which flows into Canal #1, Grand Marais Lake, Harding Ditch, Prairie du Pont Creek, and the Mississippi River without a permit in violation of the section 301 of the Clean Water Act, 33 U.S.C. § 1311.

267.    The raw sewage being discharged through Commonfields' sanitary sewer system is a pollutant, and the sewage contains other pollutants. 33 U.S.C. § 1362(6).

268.    Commonfields' sanitary sewer system, including the pipe and ditch on North 82nd Street and Canal #1 are point sources. 33 U.S.C. § 1362(14).

269.    Canal #1, Grand Marais Lake, Harding Ditch, Prairie du Pont Creek, and the Mississippi River are waters of the United States. 33 U.S.C. § 1362(7).

270.    The discharge from the pipe and ditch on North 82nd Street is continuing and likely to continue.

271.    Commonfields does not have a NPDES permit for these or any other discharges.

272.    Centreville Citizens for Change requests a declaration that Commonfields has violated and is violating section 301 of the Clean Water Act, 33 U.S.C. § 1311.

273.    For each of the violations alleged above, Commonfields is subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d) and 1365; 40 C.F.R. §§ 19.1-19.4.

## Count 2: Violation of Section 301 of the Clean Water Act - Claim for Injunctive Relief (Plaintiff Centreville Citizens for Change Against Defendant Commonfields[7])

274.    Paragraphs 1 through 273 are re-alleged and incorporated by reference.

---

[7] Plaintiff Centreville Citizens for Change intends to seek leave to amend this Complaint to add Cahokia Heights as a Defendant in Count 2, as Commonfields' successor, after Commonfields is dissolved.

275.    Commonfields' continuous and unlawful discharges of raw sewage are causing environmental degradation and harm to members of Centreville Citizens for Change.

276.    Commonfields will continue to violate section 301 of the Clean Water Act, 33 U.S.C. § 1311, in this manner, unless enjoined by the Court.

277.    Therefore, Centreville Citizens for Change seeks an injunction pursuant to section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), requiring Commonfields to halt the unpermitted discharge of sewage on North 82nd Street and comply with the Clean Water Act.

**Count 3: Takings Clause of the Fifth Amendment to the U.S. Constitution – Stormwater Flooding**

**(Plaintiffs Walter Byrd, Yvette Lyles, Jeanette Green, Leola Green, Mario and Tamara Gladney, Delores Saffold-Crigler, Leichue Hych and Lakesha Ware, Vanessa Marion, William McNeal, Lester Goree, Patricia Greenwood, Sheila Gladney, Mary Anthony, Hattie Ivy, Michael and Patricia Johnson, Sharon and Bobby Smith, Allene Hopkins, and Carolyn and Maurice Taggart ("Count Three Plaintiffs") Against Defendant Cahokia Heights)**

278.    Paragraphs 1 through 277 are re-alleged and incorporated by reference.

279.    The Fifth Amendment to the United States Constitution provides in relevant part that private property shall not be taken for public use without just compensation. U.S. Const., amend. V.

280.    The Fifth Amendment Takings Clause is applicable to the states, and to their political subdivisions, by virtue of the Fourteenth Amendment.

281.    42 U.S.C. § 1983 provides a private remedy for those whose constitutional rights are violated by the actions of a government entity.

282.     The Fifth Amendment protects a subset of the takings prohibited by the Illinois Constitution. Therefore, any taking in violation of Article I, Section 15 of the Illinois Constitution necessarily constitutes a violation of the federal Takings Clause.

283.     Count Three Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as the City of Centreville. These properties all consist of single-family homes within residential neighborhoods. Count Three Plaintiffs bought these properties with the reasonable intent to live in the homes, and to use and enjoy all rooms in the homes and to use all parts of their yards. Count Three Plaintiffs rely on Cahokia Heights' stormwater infrastructure for stormwater drainage away from their properties.

284.     The stormwater infrastructure in the portion of Cahokia Heights formerly known as the City of Centreville does not provide for necessary drainage of stormwater. Cahokia Heights has failed to provide adequately designed and operated stormwater infrastructure and failed to properly maintain its existing stormwater infrastructure, including through the following actions and inactions, *inter alia*:

   a.   Providing inadequate stormwater infrastructure that does not safely convey stormwater away from residential properties in Centreville, including, but not limited to, failing to provide a stormwater retention basin and adequate and functional stormwater lift stations; and

   b.   Failing to plan for, fund, or perform maintenance activities such as clearing vegetation and debris from stormwater ditches and other ditches, including, but not limited to, Canal #1, WPA Ditch, and the Blue Waters Ditch project.

285.     Cahokia Heights is aware of the recurrent flooding in Centreville.

286.     Cahokia Heights knew or should have known, and should have reasonably foreseen, based on complaints from the public, news reports, and letters from the Illinois Department of Natural Resources, that its failure to provide for adequate stormwater infrastructure or conduct stormwater maintenance duties would result in poor drainage that leads to flooding.

287.     The recurrent flooding caused by Defendants has directly, immediately, and radically interfered with Count Three Plaintiffs' enjoyment and use of their properties.

288.      During floods, Count Three Plaintiffs are often unable to use their yards and driveways due to the intrusion of water. The stormwater remains on Count Three Plaintiffs' properties for prolonged periods of time such that their property is unable to be fully used because of the stormwater. For example, during the recurrent floods, Count Three Plaintiffs are often unable to use their yards and driveways, including unable to exit their properties, due to the intrusion of stormwater. Accordingly, Defendant Cahokia Heights has improperly diverted and stored stormwater on Count Three Plaintiffs' properties.

289.     As a direct and proximate cause of actions and inactions by Defendant Cahokia Heights, stormwater flooding has recurrently inundated Count Three Plaintiffs' properties in Centreville. As a result of Defendant Cahokia Heights using Count Three Plaintiffs' properties for the storage of stormwater, Count Three Plaintiffs have suffered damage to their properties. Examples of the damage inflicted to Count Three Plaintiffs' respective homes and yards by the recurrent flooding includes, but is not limited to, damage to foundations, flooring, walls, hot water heaters, furnaces, and mold damage.

290.     Count Three Plaintiffs have accordingly incurred special damages to their respective properties. Among other damages, Count Three Plaintiffs have endured the recurring

presence of floodwater on their properties and in their homes, been unable to utilize their properties as originally intended when purchased, and had their properties devalued.

291.    Count Three Plaintiffs have not consented to Defendant Cahokia Heights' intrusion of their properties during the floods.

292.    Defendant Cahokia Heights has not compensated Count Three Plaintiffs for the loss, destruction, deprivation, or damage to their property rights.

293.    Defendant Cahokia Heights has accordingly taken the property of Count Three Plaintiffs for public use without just compensation, in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution. U.S. Const., amend. V.

### Count 4: Takings Clause Under Article I, Section 15 of the Illinois Constitution - Stormwater Flooding

### (Plaintiffs Walter Byrd, Yvette Lyles, Jeanette Green, Leola Green, Mario and Tamara Gladney, Delores Saffold-Crigler, Leichue Hych and Lakesha Ware, Vanessa Marion, William McNeal, Lester Goree, Patricia Greenwood, Sheila Gladney, Mary Anthony, Hattie Ivy, Michael and Patricia Johnson, Sharon and Bobby Smith, Allene Hopkins, and Carolyn and Maurice Taggart ("Count Four Plaintiffs") Against Defendant Cahokia Heights)

294.    Paragraphs 1 through 293 are re-alleged and incorporated by reference.

295.    The state of Illinois' constitution contains a takings clause. The Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law." Ill. Const. 1970, art. I, § 15.

296.    Count Four Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as the City of Centreville. These properties all consist of single-family homes within residential neighborhoods. Count Four Plaintiffs bought these properties with the reasonable intent to live in the homes, and to use and enjoy all rooms in the homes and their

yards. Count Four Plaintiffs rely on Cahokia Heights' stormwater infrastructure for stormwater drainage away from their properties.

297.   The stormwater infrastructure in the portion of Cahokia Heights formerly known as the City of Centreville does not provide for necessary drainage of stormwater. Cahokia Heights has failed to provide adequately designed and operated stormwater infrastructure and failed to properly maintain its existing stormwater infrastructure, including through the following actions and inactions, *inter alia*:

   a.   Providing inadequate stormwater infrastructure that does not safely convey stormwater away from residential properties in Centreville, including, but not limited to, failing to provide a stormwater retention basin and adequate and functional stormwater lift stations; and

   b.   Failing to plan for, fund, or perform maintenance activities such as clearing vegetation and debris from stormwater ditches and other ditches, including, but not limited to, Canal #1, WPA Ditch, and the Blue Waters Ditch project.

298.   Cahokia Heights is aware of the recurrent flooding in Centreville.

299.   Defendant Cahokia Heights knew or should have known, and should have reasonably foreseen, based on complaints, news reports, and letters from the Illinois Department of Natural Resources, that its failure to provide for adequate stormwater infrastructure or conduct stormwater maintenance duties would result in poor drainage that leads to flooding.

300.   The recurrent flooding caused by Defendants has directly, immediately, and radically interfered with Count Four Plaintiffs' enjoyment and use of their properties.

301.    During floods, Count Four Plaintiffs are often unable to use their yards and driveways due to the intrusion of water. The floodwaters remain on Count Four Plaintiffs'

properties for prolonged periods of time such that their property is unable to be fully used as a result of the floodwaters. For example, during the recurrent floods, Count Four Plaintiffs are often unable to use their yards and driveways, including the inability to leave their properties, due to the intrusion of water. Defendant Cahokia Heights has accordingly used Count Four Plaintiffs' properties for the storage of stormwater.

302.    As a direct and proximate cause of Defendant Cahokia Heights' actions and inactions, stormwater flooding has recurrently inundated Count Four Plaintiffs' properties in Centreville. As a result of Defendant Cahokia Heights using Count Four Plaintiffs' properties for the storage of stormwater, Count Four Plaintiffs have suffered damage to their properties. Examples of the damage inflicted to Count Four Plaintiffs' respective homes and yards by the recurrent flooding includes, but is not limited to, damage to foundations, flooring, walls, hot water heaters, furnaces, and mold damage.

303.    Count Four Plaintiffs have accordingly incurred special damages to their respective properties. Among other damages, Count Four Plaintiffs have endured the recurring presence of floodwater on their properties and in their homes, been unable to use their properties as originally intended when purchased, and had their properties devalued.

304.    Count Four Plaintiffs have not consented to Defendant Cahokia Heights' intrusion of their properties during the floods.

305.    Defendant Cahokia Heights has not compensated Count Four Plaintiffs for the loss, destruction, deprivation, or damage to their property rights.

306.    Defendant Cahokia Heights has accordingly taken or damaged the property of Count Four Plaintiffs for public use without just compensation, in violation of the Takings Clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 15.

85

## Count 5: Private Nuisance – Sewage

**(Plaintiffs Walter Byrd, Jeanette Green, Delores Saffold-Crigler, Leichue Hych and Lakesha Ware, William McNeal, Sharon and Bobby Smith, Patricia Greenwood, Mary Anthony, Carolyn and Maurice Taggart, Allene Hopkins, Vittorio Blaylock, and Michael and Patricia Johnson ("Count Five Plaintiffs") Against Defendant Commonfields and Defendant Cahokia Heights)**

307.    Paragraphs 1 through 306 are re-alleged and incorporated by reference.

308.    Count Five Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as the City of Centreville. Count Five Plaintiffs are connected to either Defendant Commonfields' or Defendant Cahokia Heights' sewage system. Count Five Plaintiffs have experienced recurring sewage backups from locations in their homes such as toilets, sinks, or tubs, clogged toilets or drains, or sewage bubbling up in their yards. The odor and sight of these sewage inundations and the property damage caused by them have injured Count Five Plaintiffs.

309.    These invasions of Count Five Plaintiffs' properties are substantial and cause Count Five Plaintiffs more than slight inconvenience or petty annoyance. Moreover, the invasions are unreasonable because they would offend, and have offended, reasonable residents of Cahokia Heights.

310.    Count Five Plaintiffs have not consented to Defendants' conduct in creating the unreasonably injurious conditions on their properties, or to the associated harms of that conduct.

311.    Defendants' failures to repair their overflowing sewage systems has threatened Count Five Plaintiffs' properties with sewage contamination and caused physically offensive conditions on those properties. Defendants' actions and inactions include, *inter alia*:

      a.   Defendants' failure to provide, or budget for, an adequately designed and maintained sewage system;

86

b.   Defendants' maintenance of an understaffed and under-skilled sewer system workforce;

c.   Defendant Commonfields' failure to operate an inspection and routine maintenance program;

d.   Defendant Cahokia Heights' intentional pumping of sewage and/or stormwater from inoperable lift stations into nearby waterways;

e.   Defendants' failure to repair malfunctioning sewer lift stations;

f.   Defendants' failure to eliminate inflow and infiltration; and

g.   Defendants' failure to prevent and address recurrent sanitary sewer overflows.

312.   As a direct and proximate cause of these actions and inactions, sewage has inundated Count Five Plaintiffs' properties in Centreville. But for Defendants' actions and inactions, Count Five Plaintiffs would not have had sewage entering their properties, and Defendants' actions and inactions were a substantial factor in these injuries.

313.   As a result of the sewage contamination and odors, Count Five Plaintiffs are unable to fully enjoy their properties. Defendants have accordingly invaded Count Five Plaintiffs' interests in the use and enjoyment of their property.

### Count 6: Private Nuisance – Stormwater Flooding

**(Plaintiffs Walter Byrd, Yvette Lyles, Jeanette Green, Leola Green, Mario and Tamara Gladney, Delores Saffold-Crigler, Leichue Hych and Lakesha Ware, Vanessa Marion, William McNeal, Sharon and Bobby Smith, Lester Goree, Barbara Eiland, Patricia Greenwood, Sheila Gladney, Mary Anthony, Carolyn and Maurice Taggart, Joan Dancy, Hattie Ivy, Allene Hopkins, Vittorio Blaylock, and Patricia Johnson ("Count Six Plaintiffs") Against Defendant Cahokia Heights)**

314.   Paragraphs 1 through 313 are re-alleged and incorporated by reference.

315.     Count Six Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as the City of Centreville. Count Six Plaintiffs rely on Cahokia Heights' stormwater infrastructure for stormwater drainage away from their properties. Count Six Plaintiffs have experienced recurrent flooding that has entered their yards.

316.     The recurrent floodwaters often smell of raw sewage, have damaged Count Six Plaintiffs' homes, and have endangered Count Six Plaintiffs' health and safety.

317.     These invasions of Count Six Plaintiffs' properties are substantial and cause Count Six Plaintiffs more than slight inconvenience or petty annoyance. Moreover, the invasions are unreasonable because they would offend, and have offended, reasonable residents of Cahokia Heights. Count Six Plaintiffs have not consented to Defendant Cahokia Heights' conduct in creating the unreasonably injurious conditions on their properties, or to the associated harms of that conduct.

318.     Defendant Cahokia Heights' failure to provide adequately designed or operated stormwater infrastructure and failure to properly maintain its existing stormwater infrastructure, have threatened Count Six Plaintiffs' properties with floodwaters and caused physically offensive conditions on those properties.

319.     The stormwater infrastructure in the portion of Cahokia Heights formerly known as the City of Centreville does not provide for necessary drainage of stormwater. Defendant Cahokia Heights has failed to provide adequately designed and operated stormwater infrastructure and failed to properly maintain its existing stormwater infrastructure, including through the following actions and inactions, *inter alia*:

    a.    Providing inadequate stormwater infrastructure that does not safely convey stormwater away from residential properties in Centreville, including, but not

limited to, failing to provide a stormwater retention basin and adequate and functional stormwater lift stations; and

b. Failing to plan for, fund, or perform maintenance activities such as clearing vegetation and debris from stormwater ditches and other ditches, including, but not limited to, Canal #1, WPA Ditch, and the Blue Waters Ditch project.

320. As a direct and proximate cause of these actions and inactions, stormwater flooding has inundated Count Six Plaintiffs' properties in Centreville. But for Defendant Cahokia Heights' actions and inactions, Count Six Plaintiffs would not have had floodwaters entering their properties, and Cahokia Heights' actions and inactions were a substantial factor in these injuries.

321. As a result of the frequent flooding and damage caused by the flooding, Count Six Plaintiffs are unable to fully enjoy their properties. The floodwaters remain on Count Six Plaintiffs' properties for prolonged periods of time such that their property is unable to be fully used as a result of the floodwaters. For example, during the recurrent floods, Count Six Plaintiffs are often unable to use their yards and driveways due to the intrusion of water. Examples of the damage inflicted to Count Six Plaintiffs' respective homes and yards by the recurrent flooding includes, but is not limited to, damage to foundations, flooring, walls, hot water heaters, furnaces, and mold damage. Defendant Cahokia Heights has accordingly invaded Count Six Plaintiffs' interests in the use and enjoyment of their property.

## Count 7: Public Nuisance – Stormwater Flooding

### (All Individual Plaintiffs Against Defendant Cahokia Heights)

322. Paragraphs 1 through 321 are re-alleged and incorporated by reference.

323.     All Individual Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as the City of Centreville. All Individual Plaintiffs rely on the streets and roads throughout Centreville to drive to and from work, the grocery, medical appointments, and the residences of relatives and friends, among other places. The ability to access and travel along public streets and roads is a public right.

324.     Cahokia Heights is responsible for maintaining stormwater infrastructure throughout Centreville, including, but not limited to, maintaining stormwater ditches and other ditches.

325.     The stormwater infrastructure in the portion of Cahokia Heights formerly known as the City of Centreville does not provide for necessary drainage of stormwater. Defendant Cahokia Heights has failed to provide adequately designed and operated stormwater infrastructure and failed to properly maintain its existing stormwater infrastructure, including through the following actions and inactions, *inter alia*:

a.   Providing inadequate stormwater infrastructure that does not safely convey stormwater away from residential properties in Centerville including, but not limited to, failing to provide a stormwater retention basin and adequate and functional stormwater lift stations; and

b.   Failing to plan for, fund, or perform maintenance activities such as clearing vegetation and debris from stormwater ditches and other ditches, including, but not limited to, Canal #1, WPA Ditch, and the Blue Waters Ditch project.

326.     Defendant Cahokia Heights' failure to provide adequately designed or operated stormwater infrastructure, and failure to properly maintain its existing stormwater infrastructure, proximately causes flooding that interferes with the public right to travel along the streets and

roads in Centreville. As a direct and proximate cause of these actions and inactions, stormwater flooding has inundated public streets and roads in Centreville. But for Defendant Cahokia Heights' actions and inactions, All Individual Plaintiffs would not have faced impassible streets and roads, and Cahokia Heights' actions and inactions were a substantial factor in these injuries.

327.    The public, including All Individual Plaintiffs, have been unable to use the streets and roads in Centreville during and after multiple rain events each year because flooding makes the streets and roads impassable.

328.    The flooding of the streets causes substantial public annoyance, inconvenience, and injury. For example, street flooding stops All Individual Plaintiffs from checking on elderly family members, driving to work, or a medical appointment. This interference with a public right is more than a mere annoyance or inconvenience. Moreover, the flooding injures the safety and health of the public. It can be unsafe for individuals to be islanded in their residences, and the floodwaters themselves lead to unhealthy conditions, such as by carrying sewage and/or other pollutants and by attracting mosquitoes.

329.    As a result of the frequent flooding and damage caused by the flooding, the Individual Plaintiffs are unable to safely use the streets and roads in Centreville. Accordingly, Defendant Cahokia Heights has significantly interfered with the public health, public safety, public peace, public comfort, and the public convenience.

**Count 8: Negligence – Sewage**

**(Plaintiffs Walter Byrd, Jeanette Green, Leola Green, Delores Saffold-Crigler, Leichue Hych and Lakesha Ware, William McNeal, Sharon and Bobby Smith, Patricia Greenwood, Mary Anthony, Carolyn and Maurice Taggart, Allene Hopkins, Vittorio Blaylock, and Michael and Patricia Johnson ("Count Eight Plaintiffs") Against Defendant Commonfields and Defendant Cahokia Heights)**

330.   Paragraphs 1 through 329 are re-alleged and incorporated by reference.

331.   Count Eight Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as City of Centreville. Count Eight Plaintiffs are connected to either Defendant Commonfields' or Defendant Cahokia Heights' sewage system. Commonfields and Cahokia Heights owe duties to Count Eight Plaintiffs to provide adequate sanitation and operate and maintain their sewage systems in a safe and proper fashion that avoids inundating yards and homes with sewage.

332.   Commonfields and Cahokia Heights have breached these duties by, *inter alia*, failing to provide properly designed and functioning sewage systems and failing to properly maintain their sewage systems through the following negligent actions and inactions:

a.   Defendants' failure to provide, or budget for, an adequately designed and maintained sewage system;

b.   Defendants' maintenance of an understaffed and under-skilled sewer system workforce;

c.   Defendant Commonfields' failure to operate an inspection and routine maintenance program;

d.   Defendant Cahokia Heights' intentional pumping of sewage and/or stormwater from inoperable lift stations into nearby waterways;

e.   Defendants' failure to repair malfunctioning sewer lift stations;

92

f.   Defendants' failure to eliminate inflow and infiltration; and

g.   Defendants' failure to prevent and address recurrent sanitary sewer overflows.

333.   As a direct and proximate cause of these negligent actions and inactions, sewage has inundated Count Eight Plaintiffs' properties in Centreville.

334.   Commonfields and Cahokia Heights knew, or should have known, based on complaints and the Illinois EPA notices and letters they received, that these maintenance failures would result, and did result, in sewage overflows into yards and sewage backups into homes, including the sewage inundations affecting Count Eight Plaintiffs.

335.   Defendants' breaches of their duties are the proximate cause of Count Eight Plaintiffs' injuries. But for Commonfields' and Cahokia Heights' breaches, Count Eight Plaintiffs would not have sewage overflowing into their yards or backing up into their homes, and Defendants' breaches were a substantial factor in these injuries. A reasonable sewage system operator would have foreseen that a sewage system with such significant and unresolved maintenance and infrastructure problems could overflow into yards or backup into homes.

336.   Count Eight Plaintiffs are connected to either Defendant Commonfields' or Defendant Cahokia Heights' sewage system. Count Eight Plaintiffs have experienced recurring sewage backups from locations in their homes such as toilets, sinks, or tubs, clogged toilets or drains, or sewage bubbling up in their yards. The odor and sight of these sewage inundations, and the property damage caused by them, have injured Count Eight Plaintiffs.

## Count 9: Negligence – Stormwater Flooding

### (All Individual Plaintiffs Against Defendant Cahokia Heights)

337.   Paragraphs 1 through 336 are re-alleged and incorporated by reference.

93

338.     All Individual Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as City of Centreville. All Individual Plaintiffs rely on Cahokia Heights' stormwater infrastructure for stormwater drainage away from their properties. Cahokia Heights owes a duty to All Individual Plaintiffs to operate and maintain its stormwater infrastructure in a way that does not result in floodwaters entering their yards or homes. Cahokia Heights has breached this duty because it has failed to provide adequately designed or operated stormwater infrastructure and failed to properly maintain its existing stormwater infrastructure.

339.     The stormwater infrastructure in the portion of Cahokia Heights formerly known as the City of Centreville does not provide for necessary drainage of stormwater. Cahokia Heights has failed to provide adequately designed and operated stormwater infrastructure and failed to properly maintain its existing stormwater infrastructure, including through the following actions and inactions, *inter alia*:

a. Providing inadequate stormwater infrastructure that does not safely convey stormwater away from residential properties in Centreville, including, but not limited to, failing to provide a stormwater retention basin and adequate and functional stormwater lift stations; and

b.  Failing to plan for, fund, or perform maintenance activities such as clearing vegetation and debris from stormwater ditches and other ditches, including, but not limited to, Canal #1, WPA Ditch, and the Blue Waters Ditch project.

340.     As a direct and proximate cause of these negligent actions and inactions, stormwater flooding has inundated All Individual Plaintiffs' properties in Centreville.

341.     Cahokia Heights knew, or should have known, based on complaints from the public, news reports, and letters from the Illinois Department of Natural Resources, that these

94

failures would result, and did result, in frequent floods that filled the yards and homes of All Individual Plaintiffs.

342.     Defendant Cahokia Heights' breaches of its duties are the proximate cause of All Individual Plaintiffs' injuries. But for Cahokia Heights' breaches, All Individual Plaintiffs would not have had floodwaters entering their properties, and Cahokia Heights' breaches were a substantial factor in these injuries. A reasonable municipality would have foreseen that this insufficient and poorly maintained stormwater system could be a substantial cause of flooding.

343.     The recurrent floods have injured all Individual Plaintiffs by causing damage to their property. All Individual Plaintiffs have experienced recurrent flooding that has entered their yards. These floodwaters often smell of raw sewage, have damaged Individual Plaintiffs' homes, and have endangered Individual Plaintiffs' safety. Examples of the damage inflicted to All Individual Plaintiffs' respective homes and yards by the recurrent flooding includes, but is not limited to, damage to foundations, flooring, walls, hot water heaters, furnaces, and mold damage.

## Count 10: Negligent Trespass – Sewage

### (Plaintiffs Walter Byrd, Jeanette Green, Delores Saffold-Crigler, Leichue Hych and Lakesha Ware, William McNeal, Sharon and Bobby Smith, Patricia Greenwood, Mary Anthony, Carolyn and Maurice Taggart, Allene Hopkins, Vittorio Blaylock, and Michael and Patricia Johnson ("Count Ten Plaintiffs") Against Defendant Commonfields and Defendant Cahokia Heights)

344.     Paragraphs 1 through 343 are re-alleged and incorporated by reference.

345.     Count Ten Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as City of Centreville. Count Ten Plaintiffs are connected to either Defendant Commonfields' or Defendant Cahokia Heights' sewage system. Commonfields and Cahokia Heights owe duties to Count Ten Plaintiffs to operate and maintain their sewage

systems in a way that does not result in sewage overflowing or backing up into their yards or homes.

346.     Commonfields and Cahokia Heights have breached these duties by, *inter alia*, failing to provide properly designed and functioning sewage systems and failing to properly maintain their sewage systems through the following negligent actions and inactions:

   a.  Defendants' failure to provide, or budget for, an adequately designed and maintained sewage system;

   b.  Defendants' maintenance of an understaffed and under-skilled sewer system workforce;

   c.  Defendant Commonfields' failure to operate an inspection and routine maintenance program;

   d.  Defendant Cahokia Heights' intentional pumping of sewage and/or stormwater from inoperable lift stations into nearby waterways;

   e.  Defendants' failure to repair malfunctioning sewer lift stations;

   f.  Defendants' failure to eliminate inflow and infiltration; and

   g.  Defendants' failure to prevent and address recurrent sanitary sewer overflows.

347.     As a direct and proximate cause of these negligent actions and inactions, sewage has inundated Count Ten Plaintiffs' properties in Centreville.

348.     Commonfields and Cahokia Heights knew, or should have known, based on complaints and the Illinois EPA violation notices they received, that these maintenance failures would result, and did result, in sewage overflows and sewage backups into homes, including the sewage overflows and backups affecting Count Ten Plaintiffs.

349.     Defendants' breaches of their duties are the proximate cause of Count Ten Plaintiffs' injuries. But for Defendants' breaches, Count Ten Plaintiffs would not have had sewage overflowing or backing up into their yards or homes, and Defendants' breaches were a substantial factor in these injuries. A reasonable sewage system operator would have foreseen that a sewage system with such significant and unresolved maintenance and infrastructure problems could overflow into yards or backup into homes.

350.     Count Ten Plaintiffs are connected to either Defendant Commonfields' or Defendant Cahokia Heights' sewage system. Count Ten Plaintiffs have experienced recurring sewage backups from locations in their homes such as toilets, sinks, or tubs, clogged toilets or drains, or sewage bubbling up in their yards. The odor and sight of these sewage inundations, and the property damage caused by them, have injured Count Ten Plaintiffs.

351.     Count Ten Plaintiffs were entitled to the exclusive enjoyment of their properties, including enjoyment exclusive of any invasive sewage caused by the Defendants' sewage systems.

352.     The negligent conduct of Defendants has resulted in an intrusion on Count Ten Plaintiffs' interests in exclusive possession of land. Specifically, Defendants' negligent conduct was a proximate cause of sewage entering, settling, and physically invading Count Ten Plaintiffs' properties. Count Ten Plaintiffs did not give Defendants' permission for sewage to enter their properties as a result of Defendants' negligent sewage system maintenance and operation. The intrusion of sewage onto Count Ten Plaintiffs' properties has interfered with these Count Ten Plaintiffs' use and enjoyment of their property and damaged their property.

## Count 11: Negligent Trespass – Stormwater Flooding

**(Plaintiffs Walter Byrd, Yvette Lyles, Jeanette Green, Leola Green, Mario and Tamara Gladney, Delores Saffold-Crigler, Leichue Hych and Lakesha Ware, Vanessa Marion, William McNeal, Sharon and Bobby Smith, Lester Goree, Barbara Eiland, Patricia Greenwood, Sheila Gladney, Mary Anthony, Carolyn and Maurice Taggart, Hattie Ivy, Allene Hopkins, Vittorio Blaylock, and Michael and Patricia Johnson ("Count Eleven Plaintiffs") Against Defendant Cahokia Heights)**

353.    Paragraphs 1 through 352 are re-alleged and incorporated by reference.

354.    Count Eleven Plaintiffs own and/or reside in properties in the portion of Cahokia Heights formerly known as City of Centreville. Cahokia Heights owes a duty to Count Eleven Plaintiffs to operate and maintain their stormwater infrastructure in a way that does not result in floodwaters entering their yards or homes. Cahokia Heights has breached that duty because it has failed to provide adequately designed or operated stormwater infrastructure and failed to properly maintain its existing stormwater infrastructure.

355.    The stormwater infrastructure in the portion of Cahokia Heights formerly known as the City of Centreville does not provide for necessary drainage of stormwater. Cahokia Heights has failed to provide adequately designed and operated stormwater infrastructure and failed to properly maintain its existing stormwater infrastructure, including through the following actions and inactions, *inter alia*:

    a.  Providing inadequate stormwater infrastructure that does not safely convey stormwater away from residential properties in Centreville, including, but not limited to, failing to provide a stormwater retention basin and adequate and functional stormwater lift stations; and

      b.    Failing to plan for, fund, or perform maintenance activities such as clearing

           vegetation and debris from stormwater ditches and other ditches, including, but

           not limited to, Canal #1, WPA Ditch, and the Blue Waters Ditch project.

356.     As a direct and proximate cause of these negligent actions and inactions, stormwater flooding has inundated Count Eleven Plaintiffs' properties in Centreville.

357.     Cahokia Heights knew, or should have known, based on complaints from the public, news reports, and letters from the Illinois Department of Natural Resources, that these failures would result, and did result, in frequent floods that filled the yards and homes of Count Eleven Plaintiffs.

358.     Defendant Cahokia Heights' breaches of its duties are the proximate cause of Count Eleven Plaintiffs' injuries. But for Cahokia Heights' breaches, Count Eleven Plaintiffs would not have had floodwaters entering their properties, and Cahokia Heights' breaches were a substantial factor in these injuries. A reasonable municipality would have foreseen that this insufficient and poorly maintained stormwater system could be a substantial cause of flooding.

359.     The recurrent floods have injured Count Eleven Plaintiffs by causing damage to their property. Count Eleven Plaintiffs have experienced recurrent flooding that has entered their yards. These floodwaters often smell of raw sewage, have damaged Count Eleven Plaintiffs' homes, and have endangered Count Eleven Plaintiffs' safety.

360.     Count Eleven Plaintiffs were entitled to the exclusive enjoyment of their properties, including enjoyment exclusive of any invasive stormwater flooding caused by the Cahokia Heights' stormwater system.

361.     The negligent conduct of Cahokia Heights has resulted in an intrusion on Count Eleven Plaintiffs' interest in exclusive possession of land. Specifically, Cahokia Heights'

negligent conduct was a proximate cause of floodwaters entering, settling, and physically invading Count Eleven Plaintiffs' properties. Count Eleven Plaintiffs did not give Cahokia Heights permission for floodwaters to enter their properties as a result of Cahokia Heights' negligent stormwater system maintenance and operation. The intrusion of floodwaters onto Count Eleven Plaintiffs' properties has interfered with these Count Eleven Plaintiffs' use and enjoyment of their property and damaged their property. Examples of the damage inflicted to Count Eleven Plaintiffs' respective homes and yards by the recurrent flooding includes, but is not limited to, damage to foundations, flooring, walls, hot water heaters, furnaces, and mold damage.

## **PRAYER FOR RELIEF**

362.   Wherefore, Plaintiffs respectfully request this Court to enter the following relief:

a.   a declaratory judgment that Commonfields' discharge of raw sewage into waters of the U.S. is a violation of section 301 of the Clean Water Act, 33 U.S.C. § 1311;

b.   an injunction against Commonfields, requiring it to stop operating its sanitary sewage system in violation of section 301 of the Clean Water Act, 33 U.S.C. § 1311 within 30 days of this Court's order;

c.   an order requiring Commonfields to immediately take such action as may be necessary or appropriate to prevent or minimize threats to public health and the environment that are being or may be caused by Commonfields' violations, including:

i.   funding an independent and comprehensive engineering study to identify problems with the sewer system, such as locating where inflow and

infiltration occurs in the system and identifying how sewage enters floodwaters and how that can be prevented, and

   ii.  funding an independent monitor to supervise corrective efforts;

d.  an order retaining jurisdiction of this matter until Commonfields has fulfilled its legal and Court-ordered obligations as set forth in this Complaint;

e.  an order requiring Commonfields to pay appropriate civil penalties per day for each Clean Water Act violation in an appropriate amount pursuant to 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4 Table 1;

f.  an award of litigation costs, including reasonable attorney and expert witness fees, as authorized in section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

g.  an injunction against Cahokia Heights, restraining it from depositing or diverting stormwater and sewage onto Individual Plaintiffs' properties and public roads;

h.  compensatory and other appropriate damages in an amount to be determined by the evidence at trial, including but not limited to, the diminution in value of Individual Plaintiffs' properties from Defendants' sewage contamination and stormwater flooding; damages for the harm caused to Individual Plaintiffs' properties; damages for the interference with the reasonable use, development, and enjoyment of Individual Plaintiffs' properties; and costs for remediation of their homes and properties; and

i.  such other and further relief as the Court deems just and appropriate to effectuate a complete resolution of the legal disputes between Plaintiffs and Defendants.

## JURY DEMAND

363.    Plaintiffs demand trial by jury on all issues which are triable by jury.


Respectfully submitted this 20th day of July 2021.

By: CENTREVILLE CITIZENS FOR CHANGE, WALTER BYRD, LESTER GOREE, WILLIAM MCNEAL, DELORES SAFFOLD-CRIGLER, BARBARA EILAND, SHARON and BOBBY SMITH, YVETTE LYLES, PATRICIA GREENWOOD, LEON SPRUELL, MARIO and TAMARA GLADNEY, HATTIE IVY, SHEILA GLADNEY, JOAN DANCY, MICHAEL and PATRICIA JOHNSON, VANESSA MARION, CAROLYN and MAURICE TAGGART, LEICHUE HYCH and LAKESHA WARE, MARY ANTHONY, LEOLA GREEN, JEANETTE GREEN, VITTORIO BLAYLOCK, and ALLENE HOPKINS

**Attorneys for Centreville Citizens for Change**

By: /s/ *Deborah G. Musiker*
Deborah G. Musiker (IL Bar No. 6231166)
(also known as Debbie Chizewer)
Earthjustice
311 South Wacker Drive, Suite 1400
Chicago, IL 60606
dchizewer@earthjustice.org
Tel: 773-484-3077
Fax: 312-667-8961


By: /s/ *Mary K. Rock*
Mary K. Rock (IL Bar No. 6332240),
*Southern District of Illinois Admission
Pending*
Earthjustice
311 South Wacker Drive, Suite 1400
Chicago, IL 60606
mrock@earthjustice.org
Tel: 312-800-8336
Fax: 312-667-8961


By: /s/ *Anna M. Sewell*
Anna M. Sewell (D.C. Bar No. 241861, WA
Bar No. 48736), *Pro Hac Vice Pending*
Earthjustice
1001 G Street, NW, Ste. 1000

**Attorneys for the Individually Named Plaintiffs:**

By: /s/ *Nicole D. Nelson*
Nicole D. Nelson (IL Bar No. 6300417)
Equity Legal Services, Inc.
5720 N. Belt West Suite 20-267
Belleville, IL 62226
nnelson@equitylegalservices.org
Tel: 618-693-9800
Fax: 618-693-9800


By: /s/ *Kalila J. Jackson*
Kalila J. Jackson (MO Bar No. MO61964),
*Pro Hac Vice Pending*
Metropolitan St. Louis Equal Housing &
Opportunity Council
1027 S. Vandeventer Avenue, 6th Floor
St. Louis, MO 63110
kjackson@ehoc-stl.org
Tel: 314-534-5800 x 7007

Washington, DC 20001
asewell@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356