IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CENTREVILLE CITIZENS FOR CHANGE,** *et al.*, | ) ) ) |
| **Plaintiffs,** | ) ) ) |
| vs. | ) Case No. 21-cv-842-DWD ) |
| **CITY OF CAHOKIA HEIGHTS, COMMONFIELDS OF CAHOKIA PUBLIC WATER DISTRICT, METRO EAST SANITARY DISTRICT,** | ) ) ) ) ) ) |
| **Defendants.** | ) |

### MEMORANDUM AND ORDER

**DUGAN, District Judge:**

This matter comes before the Court on several motions:

**Doc. 111**: Plaintiff Centreville Citizens for Change's Motion for Partial Summary Judgment on Clean Water Act Liability;

**Doc. 120**: Defendant City of Cahokia Heights' Motion for Partial Summary Judgment on Clean Water Act Claims;

**Doc. 124**: Defendant City of Cahokia Heights' Motion for to Dismiss or Stay Based on Primary Jurisdiction;

**Doc. 141**: Plaintiffs' Motion to Strike Defendants Exhibits at Doc. 122 and 126; and

**Doc. 150**: Plaintiff Centreville Citizens for Change's Motion to Withdraw its Motion for Partial Summary Judgment on Clean Water Act Liability.

The Court has reviewed all relevant memorandum, responses, and replies (Docs. 111, 116, 118, 119, 121, 122, 125, 126, 127, 140, 141, 142, 143, 144, 145, 150). The Court also heard arguments on Defendant City of Cahokia Heights' Motion to Dismiss Based on Primary Jurisdiction (Doc. 124), in connection with a similar motion in the related case *Bennett,*

1

*Fuse v. City of Centreville et al..*, SDIL Case No. 20-530-DWD. After considering the arguments and briefing of the Parties, the Court issues the following rulings.

## Background

In this matter, thirty-one Individual Plaintiffs, and their collective community organization, Plaintiff Centreville Citizens for Change, bring eleven claims against Defendants the City of Cahokia Heights, Commonfields of Cahokia Public Water District, and Metro East Sanitary District related to the subpar stormwater and sewage disposal systems causing frequent stormwater and raw sewage to invade the Individual Plaintiffs' homes and yards in the area now known as Cahokia Heights, Illinois. Plaintiffs' Amended Complaint (Doc. 59) asserts claims for:

- Declaratory judgment and injunctive relief for alleged violations of Section 301 of the Clean Water Act, 33 U.S.C. § 1311 (Counts 1 and 2);

- Takings pursuant to the Fifth Amendment of the United States Constitution and Article I, Section 15 of the Illinois State Constitution related to recurrent stormwater flooding (Counts 3 and 4);

- Private nuisance related to sewage contamination (Count 5) and stormwater drainage (Count 6);

- Public nuisance related to stormwater flooding (Count 7);

- Negligence related to sewage maintenance, recurrent overflows (Count 8), and recurrent stormwater flooding (Count 9); and

- Negligent trespass related to sewage overflows and backups (Count 10) and stormwater flooding (Count 11).

(Doc. 59). Plaintiffs seek monetary damages and injunctive relief, in addition to attorneys' fees and costs under the Clean Water Act.

**Docs. 111, 120, 150 Clean Water Act Liability**

Plaintiff Centreville Citizens for Change ("CCC") moved for partial summary judgment on Counts 1 and 2 of the Complaint, asking the Court to make an initial liability finding on Defendant City of Cahokia Heights' alleged violations of the Clean Water Act (Doc. 111). The Clean Water Act prohibits "the discharge of any pollutant by any person" without a permit. 33 U.S.C. § 1311(a); *Kelly v. U.S. E.P.A.*, 203 F.3d 519, 522 (7th Cir. 2000). "[D]ischarge of a pollutant" means "any addition of any pollutant to navigable waters [of the United States] from any point source." 33 U.S.C. § 1362(12); *Wisconsin Res. Prot. Council, Ctr. for Biological Diversity v. Flambeau Min. Co.*, 903 F. Supp. 2d 690, 711 (W.D. Wis. 2012). The CWA is a "strict liability statute." *Kelly*, 203 F.3d at 522. The parties dispute whether the discharge flows into "navigable waters" or "waters of the United States, including territorial seas."

Defendant City of Cahokia Heights ("Cahokia Heights") also moved for partial summary judgment on the Clean Water Act claims, asking the Court to find that Plaintiff's claims are barred by the administrative actions initiated by the United States Environmental Protection Agency and the Illinois Environmental Protection Agency (collectively referred to herein as the "Agencies") (Doc. 120). *See* 33 U.S.C. § 1365(b) (citizen suits are barred "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order[.]"); 33 U.S.C. § 1319 (Any violation "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to" the Clean Water Act addressing administrative actions

"shall not be the subject of a civil penalty action."); *United States v. Metro. Water Reclamation Dist. of Greater Chicago*, 792 F.3d 821, 825 (7th Cir. 2015) (No private litigation under the Clean Water Act "may be 'commenced' if the EPA or a state 'has commenced and is diligently prosecuting a civil … action' about the same matter the private litigant wants to raise.").

Defendant argues that Plaintiff's suit is barred because the Illinois EPA first issued a Violation Notice to Cahokia Heights concerning the issues raised in Plaintiffs' Complaint on September 30, 2020, and prior to Plaintiffs' filing of their complaint on July 20, 2021. Defendant further argues that the Agencies have been diligently prosecuting the claims ever since. The Clean Water Act does not define what constitutes "commencement" with respect to administrative action, however the Seventh Circuit looks to comparable state action. *See Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 756 (7th Cir. 2004) ("[A]n administrative action 'commences' at the point when notice and public participation protections become available to the public and interested parties."). Here, Defendant maintains that its dealings with the Illinois EPA effectively commenced an administrative action because the Illinois Environmental Protection Act requires the administrative enforcement process to begin when the Illinois EPA issues a violation notice, *see* 415 Ill. Comp. Stat. Ann. 5/31(a)(2)-(10), like it did on September 30, 2020 (Doc. 122-2). Further, Cahokia Heights represents that no judicial proceedings have started because Cahokia Heights elected to enter the Administrative Order of Consent with the United States Environmental Protection Agency rather than continuing to court (Doc. 122-7).

Plaintiff disagrees, arguing that an administrative action has not commenced yet and/or that diligence has not occurred because any actions taken so far have failed to stop the sewage discharge. *See Friends of Milwaukee's Rivers & All. for Great Lakes v. Milwaukee Metro. Sewerage Dist.*, 556 F.3d 603, 610 (7th Cir. 2009) (noting that diligent prosecution can be determined "as of the time [an agreement] is executed," in other words, after the completion of a diligent prosecution – not before one has even commenced). The focus of a diligent prosecution inquiry is whether the agency's "actions are going to bring about compliance." *Friends of Milwaukee's Rivers*, 382 F.3d at 762. Plaintiff also argues that § 1365(b) only prohibits citizen suits when there is a government prosecution "in a court." 33 U.S.C. § 1365(b)(1)(B). Thus, Plaintiff maintains that the out-of-court Administrative Order of Consent and other administrative measures cannot constitute the commencement of an administrative action to bar its suit. Plaintiff also notes that the Illinois EPA is not a party to the current Administrative Order of Consent (Doc. 122-7), and further argues that nothing prevents the Agencies from joining in the current suit, but that neither agency has intervened (Doc. 142) (citing *Student Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Monsanto Co.*, 600 F. Supp. 1479, 1483 (D.N.J. 1985) ("Should the EPA feel that this suit interferes with its attempts to secure compliance with the [Clean Water] Act, it may [intervene in this citizen suit].")).

After hearing arguments on these motions (Doc. 147), Plaintiff CCC moved to withdraw its motion for partial summary judgment (Doc. 150). Plaintiff represents that it seeks to withdraw its motion, in part, because the Court "expressed interest" in the potential benefit of having expert testimony on this issue at oral argument. While the

Court finds it appropriate to grant Plaintiff's Motion to Withdraw, whether or not the parties elect to use experts in their case is an issue entirely within the parties' purview. Plaintiff CCC's Motion to Withdraw its Motion for Partial Summary Judgment (Doc. 150) is therefore **GRANTED**, and the Motion for Partial Summary Judgment at Doc. 111 is hereby **WITHDRAWN**.

Defendant Cahokia Heights' Motion for Partial Summary Judgment (Doc. 120) will be denied. Although the record supports a finding that the Agencies have been working with Cahokia Heights to resolve alleged Clean Water Act violations, and other portions of Plaintiffs' claims here, at best there are genuine disputes of material fact over whether the Agencies' actions can be construed as diligent. Further, even if the out-of-court actions taken by the Agencies could bar Plaintiffs' suit when neither Agency has sought to initiate formal court proceedings, evidence in the record also suggests that the stormwater and sewage issues which have been impacting Plaintiffs have been prevalent in the community for years (Docs. 111-2; 111-3; 111-4; 111-5; 111-6; 111-11, at Ex. 11; 111-13). Accordingly, based on the record currently before the Court, there are clearly issues of fact as to whether the Agencies' actions have been sufficiently formal or diligent to bar Plaintiffs' suit. Defendant's Motion for Summary Judgment (Doc. 120) is therefore **DENIED**.

### Doc. 124: Cahokia Heights' Motion to Dismiss Based on Primary Jurisdiction

Defendant Cahokia Heights also asks the Court to dismiss or stay this matter pending resolution of the United States Environmental Protection Agency's administrative proceedings with Cahokia Heights based on the "doctrine of primary

6

jurisdiction." *See Stoll v. Kraft Foods Glob., Inc.*, No. 1:09-CV-0364-TWP-DML, 2010 WL 3702359, at *1 (S.D. Ind. Sept. 6, 2010) (the "doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight.'") (citing *Leib v. Rex Energy Operating Corp.*, No. 06-CV-802-JPG-CJP, 2008 WL 5377792, at *14 (S.D. Ill. Dec. 19, 2008) (quoting *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004)). "When a court chooses to exercise primary jurisdiction, it does not dismiss the litigation but stays it pending the results of the agency's resolution of the issue, and the action resumes after the agency's decision if that decision has not resolved the entire controversy." *Leib*, 2008 WL 5377792, at *14 (citing *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004); *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 651 (7th Cir. 2002)).

The Seventh Circuit has used this doctrine to refer questions of statutory interpretation to relevant agencies. For example, the Seventh Circuit referred the interpretation of the word "location" as found in the telephone "number portability" provision of the Federal Communications Commission Telecommunications Act of 1996, 47 U.S.C. § 153(37) to the Federal Communications Commission ("FCC"). *See In re StarNet, Inc.*, 355 F.3d at 639. In making this referral, the Seventh Circuit emphasized that the FCC did not have exclusive jurisdiction over the interpretation, but that its input was the "logical place for the judiciary to start." *Id.* ("Only the FCC can disambiguate the word 'location'; all we could do would be to make an educated guess. And although the

7

FCC's position would be subject to review by the judiciary for reasonableness, the agency's views are the logical place to start.").

The Circuit has also declined to invoke the doctrine when it would "facilitate an end run around" citizen suits authorized by statute, such as when the administrative proceedings were informal or would not address the relief raised in the citizen suit. *See PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998) (finding the doctrines of primary jurisdiction doctrine or abstention inappropriate to bar a citizen suit brought under the Resource Conservation and Recovery Act ("RCRA") because there were no formal administrative proceedings in progress that the suit would disrupt and those administrative proceedings would not address the concerns raised in the citizens' suit); *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 132 (7th Cir. 1991) (declining to apply the doctrine of primary jurisdiction when both parties agreed that the EPA could not provide the plaintiff with any form of compensatory or punitive damages, and speculating what role the EPA could even play in the suit).

In considering whether the relevant administrative proceedings are "formal" or "informal", it is important to note that the doctrine of primary jurisdiction differs from statutory bars to citizen suits based on the "diligent prosecution" of an action by federal or state agencies. *See, e.g.*, 33 U.S.C. § 1365(b)(1)(B) (citizen suits under the Clean Water Act are barred "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order[.]"). Instead, the Seventh Circuit has explained, that even if a citizen suit is not statutorily barred by a formal administrative

proceeding, appropriate circumstances may still exist to apply the doctrine of primary jurisdiction. *See PMC, Inc.*, 151 F.3d at 619 (explaining that although the citizens' suit under RCRA was not statutorily barred, "there may be room for applying the doctrines of abstention or primary jurisdiction (different labels for the same thing, in this context) in cases in which a state has a formal administrative proceeding in progress that the citizens' suit would disrupt [.]").

According to Defendant, a stay of the current proceedings is appropriate because the United States Environmental Protection Agency, and the Illinois Environmental Protection Agency (collectively referred to herein as the "Agencies") have been working with Cahokia Heights to address the sanitary sewer overflows at issue in Plaintiffs' complaint for years, and Defendants believe some, if not all, of the injunctive relief in Plaintiffs' complaint may be resolved by those ongoing efforts. Specifically, on August 16, 2021, Cahokia Heights entered into an Administrative Order on Consent ("AOC") with the United States EPA (Doc. 126-7). Under the AOC, Cahokia Heights agreed to undertake several projects to address the Agencies' concerns regarding the conditions of Cahokia Heights' sewer system and lift stations, including requiring Cahokia Heights to:

1. Execute a series of interim operations and maintenance actions, including staff training, preparing a lift station status report, and submitting a lift station inspection and maintenance plan;
2. Develop and implement a Capacity, Management, Operations and Maintenance Program;
3. Prepare and implement investigation plans to identify and better understand both wet weather and dry-weather sanitary sewer overflows; and
4. Prepare and implement a corrective action plan to eliminate all known dry-weather sanitary sewer overflows.

(Doc. 126-7, pp. 2, pp. 8-12).  According to Defendant, Cahokia Heights has been timely implementing the requirements of the AOC, and the now approved Capacity, Management, Operations, and Maintenance Program.

In addition to the AOC, Cahokia Heights is implementing system repairs with grant funding from the Illinois EPA, which requires Cahokia Heights to complete certain construction activities by June 30, 2025 (Doc. 126-8).  The Illinois EPA also approved Cahokia Heights' Construction Activities Strategies ("CAS") for the project (Doc. 126-10), and Defendant represents that design and construction is underway.  Finally, Defendant maintains that it is in the process of negotiating a civil Consent Decree to govern the final stages of the system repair that would reflect the Agencies' judgment of what additional measures are necessary to complete the corrective action and prevent future sanitary sewer overflows and potential violations of the Clean Water Act (Doc. 124; Doc. 126, ¶ 14).

Defendant argues that dismissal or a stay of these proceedings would be appropriate while the Agencies are overseeing the repairs in the Administrative Order on Consent and negotiating the civil Consent Decree with Cahokia Heights.  Defendant requests dismissal, but also offers August 30, 2025 as a potential stay date.  This date allegedly represents the end date for the current repair work funded by the Illinois EPA grant.  Plaintiffs oppose the Motion, arguing that the doctrine of primary jurisdiction does not apply to this case because the case only involves individual claims (Doc. 143).  Plaintiffs also submit that even if the doctrine does apply, the stay factors sharply favor denying the stay because the Administrative Order on Consent does not conflict with

Plaintiffs' claims, which are properly before the Court, and because applying the doctrine would disserve judicial economy. Alternatively, Plaintiffs ask that the Court consider bifurcating Plaintiffs' individual claims which are not covered by the current administrative plans (Doc. 143).

The Seventh Circuit has adopted a "case by case" approach in determining when the doctrine of primary jurisdiction should apply. *Ryan*, 935 F.2d at 131 (citing *Bradford Sch. Bus Transit, Inc. v. Chicago Transit Auth.*, 537 F.2d 943, 949 (7th Cir. 1976)) ("There is no fixed formula for the invocation of the doctrine of primary jurisdiction and 'the decision whether to apply it depends upon a case by case determination … .'"). In making this determination, the Court considers the strong policy reasons that exist for applying the primary jurisdiction doctrine, namely, that the doctrine: (1) promotes consistency and uniformity, particularly where the development of the law is dependent upon administrative policy; (2) administrative agencies are uniquely qualified to handle certain complex areas outside of the conventional expertise of courts; and (3) it serves judicial economy because, if a dispute is fully resolved by an agency, the court need not intervene. *Ryan*, 935 F.2d at 131; *see also Stoll*, 2010 WL 3702359, at *5.

Although the Seventh Circuit has not articulated an exclusive list of factors for applying the doctrine of primary jurisdiction, some district courts have found it appropriate to weigh numerous factors, including:

> (1) whether the Court is being called on to decide factual issues not within the conventional experience of judges; question at issue is one within the conventional experience of judges; (2) whether the Defendants could be subjected to conflicting orders of both the Court and the administrative agency; (3) whether relevant agency proceedings have actually been

> initiated; (4) whether the agency has demonstrated diligence in resolving the issue or has instead allowed the issue to anguish; and (5) whether the Court can fashion the type of relief requested by the plaintiff.

*Stoll*, 2010 WL 3702359, at *5 (collecting cases).

Here, the Court sees vast wisdom in permitting the United States Environmental Protection Agency and Illinois Environmental Protection Agency to provide guidance and manage the highly technical and expensive repairs needed to address infrastructure issues identified in this matter. *In re StarNet, Inc.*, 355 F.3d at 639 (the "doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight.'"). The engineering and mechanical expertise needed to facilitate the fashioning and, ultimately, the enforcement of the equitable remedies sought in this matter will likely be formidable, requiring the Court to weigh the efficacy and appropriateness each aspect of the project. While this is not necessarily beyond the reach of the Court, it will require expert witness testimony and determination of facts based upon the evidence not within its conventional experiences.

The Court therefore **FINDS** that the strong policy reasons behind the primary jurisdiction doctrine would be served in this case by a limited referral to the environmental Agencies. There is no dispute that the environmental Agencies are aware and involved with the extensive issues plaguing Plaintiffs' communities. Nor is there a dispute over the Agencies' unique qualifications for handling the complex issues here, or their ability to fashion and oversee appropriate remedies to the physical infrastructure

required to address some, if not all, of the injunctive relief issues in Plaintiffs' Complaint. Judicial economy would further be served by enlisting the Agencies' oversight here, as they are uniquely equipped to effect and enforce remediation efforts over these repairs. Further, should the Agencies be successful in compelling the remediation of the issues raised in the injunctive portion of Plaintiffs' Complaint, the Court will alleviate any risk of subjecting the parties to conflicting orders from the Court and the administrative Agencies, or worse, from subjecting the parties to a Court Order that does not fully address the practical, and potentially changing, needs of the infrastructure repairs. Accordingly, the Court will **GRANT** Defendants' Motion to Stay, in part, and **REFER** this matter to the environmental Agencies for assistance in evaluating and resolving the injunctive relief portion of Plaintiffs' Complaint.

Nevertheless, despite these findings, the Court is gravely concerned with issues of diligence here. This case has been pending for some time, and Plaintiffs have invested time in litigating this case and bringing their grievances to the attention of the Court and the administrative Agencies. Thus, the Court is very concerned with Plaintiffs' claims being set to languish without concrete and diligent actions from the Agencies. Indeed, while the record before the Court does not give the Court a reason to question Defendants' intentions in working with the environmental Agencies to consummate a consent decree or make necessary repairs, the Court is equally cognizant that Plaintiffs and the Court have heard reports of these negotiations for years, without having direct access to the process, direction, or progress of the repairs. Although these concerns do not outweigh the Court's prior findings that a limited referral of this case is necessary

and prudent, the Court will require regular status reports from Defendants and the environmental Agencies on the progress of the referral, and the status of the alleged forthcoming consent decree.

These status reports shall be filed no less frequently than every 90 days in the public record and be made available to Plaintiffs and their counsel. The Court wishes to impress upon the Defendants that the information contained in these status reports must be thorough and specific to, and not mere summaries of, the work done, the progress made, the plans implemented, and anticipated timelines for each step of progress forecasted. This is because, upon the filing of each status report, the Court will re-evaluate the progress and diligence of the ongoing repairs, and if it becomes apparent to the Court that the referral no longer serves the interest of justice, judicial economy, or is prejudicial to any of the parties, the Court will revise the referral or consider bifurcating these proceedings.  However, at this junction, the wisdom of permitting the environmental Agencies to evaluate and fashion a practical and effective remedy here should first be explored.

For these reasons, the Court **GRANTS, in part**, Defendants' Motion to Stay (Doc. 124), and **REFERS** the following issues to the consideration of the United States Environmental Protection Agency and the Illinois Environmental Protection Agency:

    1.    The scope and nature of the repairs that would be necessary to address the requested injunctive relief in Plaintiffs' Complaint at Doc. 59, including how to ensure: (1) stormwater and wastewater are not deposited or diverted onto Plaintiffs' properties; (2) all pump stations are working at adequate

14

capacity; (3) the necessity and locations required for the installation of new pump or lift stations and/or sewer lines; (4) no Clean Water Act Violations occur; and (5) any other recommended repairs to the infrastructure issues identified in Plaintiffs' Complaint;

      2.      The progress of Cahokia Heights' compliance with its obligations under the above-identified Administrative Order on Consent; Capacity, Management, Operations and Maintenance Program; Constructive Activities Strategies; and any other like orders, agreements, or obligations with the United States Environmental Protection Agency and the Illinois Environmental Protection Agency related to the issues identified in Plaintiffs' Complaint;

      3.      The specifics of whether, when, and to what extent the existing Administrative Order on Consent; Capacity, Management, Operations and Maintenance Program; Constructive Activities Strategies; and any other like orders, agreements, or obligations with the with the United States Environmental Protection Agency and the Illinois Environmental Protection Agency will address the requested injunctive relief in Plaintiffs' Complaint at Doc. 59; and

      4.      The progress and anticipated completion date of Cahokia Heights' negotiations with the United States Environmental Protection Agency and the Illinois Environmental Protection Agency to enter into a civil Consent Decree, and the specifics of the corrective action contemplated in the forthcoming Consent Decree.

In accordance with this referral, these proceedings are **STAYED** in their entirety for 90-days, or until further order of the Court.  By **February 1, 2024**, Defendants are **DIRECTED** to file a status report with the Court, detailing the progress made by the Agencies in addressing the Court's referred issues above.

Defendants are **DIRECTED** to send a copy of this Order to their contacts and representatives at the United States Environmental Protection Agency and the Illinois Environmental Protection Agency, and to provide public access to this Order.

The parties are further granted leave to petition the Court to modify the current stay and referral should appropriate circumstances exist to do so.  Finally, Plaintiffs' Plaintiffs' Motion to Strike Defendants Exhibits at Doc. 122 and 126 (Doc. 141) is **DENIED**.

**SO ORDERED.**

Dated: January 5, 2024

---

DAVID W. DUGAN
United States District Judge